*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0121P (6th Cir.)
File Name: 00a0121p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

JOHN W. BYRD, JR.,
     *Petitioner-Appellant,*

       *v.*           No. 96-3209

TERRY L. COLLINS, Warden,
     *Respondent-Appellee.*

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 94-00167—James L. Graham, District Judge.

Argued: March 11, 1998

Decided and Filed: April 6, 2000

Before: JONES, SUHRHEINRICH, and BATCHELDER,
Circuit Judges.

———————————

### COUNSEL

**ARGUED:** Richard J. Vickers, PUBLIC DEFENDER'S OFFICE, OHIO PUBLIC DEFENDER COMMISSION, Columbus, Ohio, for Appellant. Stuart A. Cole, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for Appellee. **ON BRIEF:** Richard J. Vickers, PUBLIC DEFENDER'S OFFICE, OHIO PUBLIC DEFENDER COMMISSION, Columbus, Ohio, Steven M. Brown,

1

Columbus, Ohio, for Appellant.  Stuart W. Harris, OFFICE OF THE ATTORNEY GENERAL, CAPITAL CRIMES SECTION, Columbus, Ohio, for Appellee.

SUHRHEINRICH, J., delivered the opinion of the court, in which BATCHELDER, J., joined.  JONES, J. (pp. 91-109), delivered a separate dissenting opinion.

————————

## OPINION

————————

SUHRHEINRICH, Circuit Judge.  In August 1983, the Court of Common Pleas in Hamilton County, Ohio, sentenced Petitioner, John W. Byrd, Jr., to death for the aggravated murder of Monte Tewksbury.  The Ohio state courts repeatedly rejected Petitioner's claims for relief.  In March 1994, only days before his scheduled execution, Petitioner filed his first petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The U.S. District Court for the Southern District of Ohio denied the petition.  We now **AFFIRM** that denial.

### I.  Background

### A.  Facts

On the evening of April 17, 1983, Monte B. Tewksbury was working alone as the night clerk at the King Kwik convenience store at 9870 Pippin Road in Hamilton County, Ohio.  Monte was married and was the father of three children.

At approximately 11:00 p.m., two robbers entered the store in masks; one of them carried a bowie knife with a five-inch blade.  The robbers removed all of $133.97 from the cash register.  In addition, they took Monte's Pulsar watch, wedding ring, and his wallet which contained cash, credit cards, and an automobile registration slip.  Then, as Monte stood with his hands raised and his back to the robbers,

Petitioner plunged his bowie knife to the hilt in Monte's side, resulting in a puncture wound to the liver that caused massive internal bleeding. The two robbers ripped the inside telephone out of the wall and fled. At approximately 11:10 p.m., Robert Shephard was driving northbound on Pippin Road. He observed two men run from the King Kwik and enter a large red van parked at the corner of Pippin and Berthbrook. The van then drove off.

Although severely injured, Monte managed to exit the store and get to the outside telephone. He called his wife, Sharon Tewksbury, told her he had been robbed and hurt, and that she should call the police and an ambulance. At that time, Cecil Conley, a prospective customer, arrived at the King Kwik. Conley found Monte standing outside the building and leaning against the wall next to the telephone. Monte was bleeding from his side. Conley helped Monte into the store, went back to the telephone which was still off the hook, and spoke briefly to Sharon. Conley also advised Sharon to call an ambulance, and he himself called the police. Monte told Conley "I'm going to die," and that he had been robbed and cut with a knife. Monte described the robbers as two white men wearing stocking masks.

Sharon arrived at the scene and held her dying husband in her arms as he repeated his statements. Police and medical help then came, and Monte was transported to a hospital. While en route, Monte made several statements to the effect that he did not understand why he had been stabbed, because he had been cooperative and had given the robbers everything they requested. Monte also made a statement to the effect of "Thank God I didn't see it coming," which supports the conclusion that his back was to his assailants when he was stabbed. Almost immediately after he was taken to the emergency room, Monte's heart stopped. Despite heroic efforts to save his life, Monte died at 1:15 a.m., April 18, 1983, from exsanguination resulting from his stab wound.

That night, a short time after the King Kwik robbery, Jim Henneberry, a clerk at a nearby U-Totem store, was standing

at the cash register. A customer, Dennis Nitz, was playing a video game near the front door when two robbers entered the store wearing masks. Henneberry realized what was occurring and fled to a room in the rear of the store. One of the robbers chased after Henneberry with a knife. The robber tried unsuccessfully to force open the door to the room. Meanwhile, the other robber pushed Nitz back when he attempted to leave; however, Nitz was able to dodge him and get out. The robbers were unable to open the cash register, so they took it with them. Robin Hannon, a resident of an apartment located near the U-Totem, was disturbed by the noise from a loud muffler. Hannon looked outside and observed two people getting into a large red van parked in the U-Totem lot. The van had a defective tail light.[1]

Shortly after 1:00 a.m. on April 18, 1983, two police officers from Forest Park in Hamilton County were seated in a marked police cruiser eating their lunch. The officers were in a K-Mart parking lot, which was located in an area containing principally commercial establishments, some of which had recently been burglarized. The officers had been advised approximately forty-five minutes earlier by their supervisor about the incident at the King Kwik. As the officers watched, a red cargo van drove by at a slow rate of speed. The van pulled into the K-Mart lot, and its headlights were turned off. A few minutes later, the van's headlights came back on, and the van left the lot. However, the van returned within five minutes, again at low speed, from the direction opposite to that in which it had gone moments before.

The police officers became suspicious, followed the van, and, upon inquiry of the police dispatcher, learned the identity of its owner. The van pulled into a parking lot adjacent to a closed United Dairy Farmers store. The officers pulled behind the van after summoning back-up assistance. One of

adequately develop evidence which may establish that the findings were actually erroneous. Such a ruling would defeat the entire purpose of the pre-AEDPA § 2254(d) – which, again, presumes, rather than requires, the correctness of state findings. Yet this appears to be exactly what the district court did in this case, seemingly determining that the state court findings were binding, rather than ascertaining whether Byrd had alleged sufficient facts to overcome the presumption.

The district court abused its discretion by not allowing discovery and an evidentiary hearing on Byrd's claims of false testimony and suppression. Since the record already supports a number of Byrd's claims of constitutional error, it is clear that he has, at least, alleged sufficient facts to require a full and fair evidentiary hearing on his claims. Moreover, the district court erred by determining that the presumption of correctness necessarily foreclosed an evidentiary hearing. The applicability of the presumption of correctness and the propriety of an evidentiary hearing are two interrelated, yet fundamentally distinct, issues. Byrd has yet to be afforded any meaningful opportunity to conduct discovery, and has consistently been denied an evidentiary hearing.

Accordingly, at minimum, Byrd should be granted discovery and an evidentiary hearing limited to the specific evidentiary requests he made previously before the district court, and to those requests pertinent to his false testimony and suppression claims. Given that there already exists significant evidence that Byrd's conviction was secured in violation of bedrock constitutional guarantees of due process and fundamental fairness, discovery is the least that is required before this court pushes him further down the road toward execution.

---

[1] In the course of the subsequent police investigation, Hannon identified the van, which had remained in police custody, as the one she saw outside the U-Totem on the night in question.

the credibility of Ronald Armstead was subject to extensive cross-examination, that there is no credible evidence that Ronald Armstead lied in his testimony, and that Ronald Armstead was not given consideration by the State in return for his testimony.

The majority contends that the August 5, 1988 discovery order provided Byrd with sufficient opportunity to develop his claims. However, a close read of the record reveals that this order had little effect on Byrd's ability to obtain the information he sought. For example, Byrd asserts that he filed a "Motion For Release of Records" in July 1988, and the trial court issued the August 5 order in response to that motion. According to Byrd, "[defense] counsel sought all available records through use of this motion." J.A. at 279. Thus, despite the majority's claim to the contrary, *see ante* at 39, Byrd did indeed attempt to utilize the August 5 order to obtain information, but was thwarted in his attempts. Byrd further asserts that he filed two additional motions, prior to the July 1988 motion, requesting discovery from the Hamilton County Sheriff's Office and the Hamilton County Prosecutor's Office. Byrd contends that this information would have detailed contacts between inmates Ronald Armstead, Virgil Jordan, Marvin Randolph, Robert Jones and the prosecutor's or sheriff's office. Byrd also requested discovery to determine why Armstead was chosen among four jailhouse informants who offered testimony against him. Byrd asserts that the documents establish that the prosecutor's office knew Armstead was returning to prison, and shed light on any consideration Armstead received for his testimony. Without adequate discovery in these areas, Byrd has not been afforded a full and fair opportunity to factually develop his claims.

Even if Byrd has not established a § 2254(d) exception, he has nevertheless overcome the presumption of correctness by averring sufficient facts, which if fully developed, would entitle him to relief. It would be unjustifiably circular for this Court to hold that a state court's findings were binding, without providing the petitioner an opportunity to fully and

the passengers, later identified as John Eastle Brewer, exited the van and approached the police car. Brewer identified himself as "David Urey" and told the police he had no identification. Brewer provided inconsistent stories about why he was in the area. One of the officers asked Brewer to remain in the cruiser while he approached the van. The van's driver, William Danny Woodall, and Petitioner provided the officer with identification, which was called in to the dispatcher. Although there were no current warrants for either Petitioner or Woodall, the dispatcher reported that both had prior felony convictions. The officer shined a flashlight inside the van and saw coins on the floor. There were stocking masks and a knife located in a tray on the dashboard. A Shell credit card in Sharon's name was lying on the floor under the passenger seat. There was also what appeared to be fresh blood on the interior side of the driver's seat. A drawer from a cash register was in the back of the van.

### B. Indictment and Trial

On the basis of this evidence, Petitioner, Brewer, and Woodall were arrested. In an indictment returned on May 26, 1983, the three were charged with aggravated murder and three counts of aggravated robbery. Petitioner also was charged with two death penalty specifications; i.e., that he was the "principal offender" who committed the aggravated murder of Monte Tewksbury while committing or attempting to commit the aggravated robbery of the King Kwik, as well as the aggravated robbery of Monte Tewksbury himself.[2] Pleas of not guilty were entered as to all charges on May 31, 1983. Petitioner's counsel filed a series of pre-trial motions, including one seeking the suppression of evidence taken from the van. The Hamilton County Court of Common Pleas denied this motion on July 26, 1983. Jury selection for Petitioner's trial began on August 1, 1983, and lasted five days.

---

[2] In Ohio, the "principal offender" means "the actual killer." *State v. Penix*, 513 N.E.2d 744, 746 (Ohio 1987).

The main evidence introduced at trial to prove that Petitioner was the principal offender, i.e., the individual who actually stabbed and murdered Monte, came from Ronald Armstead, who at the time of trial, was serving a sentence at the Cincinnati Workhouse (Cincinnati Correctional Institute). Armstead testified that he recalled Petitioner's, Brewer's, and Woodall's arrival at the Workhouse and that, practically from the date of their arrival, they had bragged about committing the King Kwik robbery and Monte's murder. Armstead testified that, approximately three weeks after the robbery, he was with Petitioner, Brewer, Woodall, and others when a *P.M. Magazine* television program aired featuring footage of the Tewksbury family. The footage, which included singing by Monte's daughter, was taped the day before Monte was murdered. According to Armstead, Petitioner stated during the telecast that Monte deserved to die and, either then or at another time, admitted to Armstead that he had killed Monte because Monte had "gotten in the way." Armstead also testified that Petitioner sought advice from him regarding whether the prosecution could detect blood stains on a knife blade if it had been cleaned.[3]

The State called a total of twenty-six witnesses at the guilt stage. Petitioner, on the other hand, called only one witness, a police officer who identified some of Woodall's clothing. Closing arguments were presented on August 12, 1983, after ten days of trial. Late that evening, the jury asked the court to have Armstead's testimony read back. Over objection, the court reporter read the entirety of Armstead's testimony to the jury in open court. Shortly thereafter, the jury returned its verdict finding Petitioner guilty of aggravated murder and two counts of aggravated robbery.[4] The jury also found Petitioner guilty of the two death penalty specifications.

---

[3] Armstead's testimony is set forth in greater detail in Part II-A, *infra.*

[4] The trial court severed the count in the indictment charging Petitioner with aggravated robbery of the U-Totem.

conducting evidentiary hearings. The presumption of correctness is just that – a rebuttable presumption, not an inexorable command. *See* 28 U.S.C. § 2254(d) (providing that petitioner must "establish by convincing evidence that the factual determination by the State was erroneous" when a § 2254(d) exception is inapplicable); *Brown v. Davis*, 752 F.2d 1142, 1147 (6th Cir. 1985) ("To overcome the presumption of correctness, the petitioner must establish by convincing evidence that the factual determination in the state court was erroneous."). Within the operation of "sound discretion," district courts maintain significant authority to receive evidence pertaining to the legitimacy of federal claims. This discretion to order discovery or hold evidentiary hearings, however, becomes an obligation when "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Harris v. Nelson*, 394 U.S. 286, 300 (1969). In these circumstances, "it is the ***duty*** of the court to provide the necessary facilities and procedures for an adequate inquiry." *Id.* (emphasis added); *see Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997) (holding it is an abuse of discretion to deny discovery when specific factual allegations, if fully developed, would entitle petitioner to relief); *see also Lynott v. Story*, 929 F.2d 228, 232 (6th Cir. 1991); *McDaniel v. United States Dist. Court for the Dist. of Nev.*, 127 F.3d 886, 888 (9th Cir. 1997)(per curiam).

At least three exceptions to the § 2254(d) presumption of correctness apply in this case: (i) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (ii) the material facts were not adequately developed at the state court hearing; and (iii) the factual findings made by the state court were not supported by the record. 28 U.S.C. §§ 2254(d) (2), (3) & (8). Even the district court acknowledges that Byrd's discovery requests were consistently rebuffed by Ohio courts. Indeed, Byrd has never been afforded the opportunity to fully discover relevant documents, depose witnesses, or adequately develop his claims. Additionally, several of the "facts" found by the state court appear to be unsupported by the record – namely that

The majority dismisses this request by concluding that since Byrd was unable to establish an exception to the presumption of correctness afforded state court factual findings under 28 U.S.C. § 2254(d) (West 1995), the district court properly deferred to state findings of fact and, consequently, did not abuse its discretion in denying further discovery. The majority's analysis is flawed, however, both in its discussion of the inapplicability of §2254(d), and in its consolidation of the discovery determination with its resolution of the presumption of correctness issue.

In habeas proceedings *initiated prior* to the effective date of the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254, federal courts must presume the correctness of state court factual findings unless an exception under the former version of §2254(d) applies.[2] *See Lindh v. Murphy*, 521 U.S. 320, 326-327 (1997); *Gilliam v. Mitchell*, 179 F.3d 990, 991 (6th Cir. 1999). When an exception does apply, and the habeas petitioner's factual allegations, if proved, would entitle him to relief, the district court is *required* to hold an evidentiary hearing. *See McMillan v. Barksdale*, 823 F.2d 981, 983-84 (6th Cir. 1987); *Rector v. Johnson*, 120 F.3d 551, 562-63 (5th Cir. 1997) ("[A] federal habeas court must allow discovery and an evidentiary hearing only where a factual dispute, *if resolved in the petitioner's favor*, would entitle him to relief and the state has not afforded the petitioner a full and fair evidentiary hearing.") (quoting *Ward v. Whitley*, 21 F.3d 1355, 1367 (5th Cir. 1994)); *Jeffries v. Blodgett*, 5 F.3d 1180, 1187 (9th Cir. 1993) ("A federal evidentiary hearing is mandatory if (1) petitioner's allegations, if proven, would establish the right to relief, and (2) the state court trier of fact has not, after a full and fair hearing, reliably found the relevant facts.").

Moreover, even when an exception is inapplicable, federal courts are not thereby prevented from ordering discovery or

[2] *See Ante* at 34, n.23 (listing statutory factors under former version of § 2254(d)).

The sentencing phase of the trial began on August 16, 1983. Petitioner called one witness, his mother, Mary Lou Ray. Mrs. Ray testified that she gave birth to Petitioner when she was sixteen years old and her marriage to Petitioner's father ended shortly thereafter. She testified that Petitioner's father went to jail shortly after their son was born and she had not seen her ex-husband in eighteen years. She also discussed her subsequent failed marriages to two men, both of whom abused Petitioner. For instance, Mrs. Ray testified that she married Ed Ryan, and the marriage lasted three years. She stated that Ryan "was mean to Johnny [Petitioner]. When Johnny got older, he blacked his eyes. . . . [Petitioner] couldn't do nothing right to please him." Tr. at 1762. Mrs. Ray also described a learning disability from which Petitioner suffered throughout his schooling. According to Mrs. Ray, Petitioner was extremely frustrated by the ridiculing he received from other children. Finally, Mrs. Ray recounted how at age eleven Petitioner assisted another young child who had fallen into a frozen creek.[5] On cross-examination, Mrs. Ray admitted that she had filed several petitions with the juvenile court alleging her inability to maintain control of her son. She also conceded that she had never reported any abuse of Petitioner to the authorities.

As permitted under Ohio law, Petitioner then made an unsworn statement to the jury. He expressed remorse for what happened to Monte and his family, noted that he was only 19 years old, and made a plea for his life. The State presented no witnesses at the sentencing hearing. Later the same day, the jury found that the aggravating circumstances outweighed the mitigating factors and recommended imposition of the death penalty. On August 19, 1983, the trial court adopted the jury's recommendation and sentenced Petitioner to death as the principal offender in the felony

[5] In an opinion setting forth its reasons for imposing the death penalty, the trial court concluded: "This being the only socially redeeming act of the defendant's life offered or otherwise shown by the evidence it does not rise to the level of a mitigating factor." JA at 1134.

murder charge and to consecutive jail terms of seven to twenty-five years on the two aggravated robbery counts.

The trial court issued a written opinion on August 30, 1983, explaining that it had found beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating factors in Petitioner's case. The court noted that the jury found two statutory aggravating circumstances; i.e., that the murder occurred in connection with two different aggravated robberies. The court concluded "that defendant's killing of the victim was completely unnecessary and cold blooded since the victim had submitted peacefully and turned over his personal possessions and money. This killing . . . evidenced the particularly malicious outlook of this defendant." JA at 1130. The court further stated: "The proved facts of the aggravating circumstances reveal a pattern of willful, cold-blooded disregard for human life and values well beyond what this judge has seen in other cases." JA at 1132.

The court then reviewed the mitigating factors in Petitioner's case. The court specifically rejected Petitioner's youth as a consideration, noting that Petitioner was "the oldest 19 year old this Judge has ever seen."[6] JA at 1131. The court also considered the nature and circumstances of the offense, listed under Ohio law as possible mitigating factors. However, the court noted the unnecessary and brutal nature of the murder and commented as to the evidence of the incident at the U-Totem store as well.

The only mitigation evidence the trial court believed worthy of consideration was the evidence of Petitioner's unhappy childhood, lack of paternal love and affection, and some degree of abuse. The court stated that there was nothing introduced at trial which showed that Petitioner's childhood experiences resulted in any emotional scarring that could

---

[6]Similarly, a concurring opinion in the Ohio Supreme Court remarked that "the evidence in this record demonstrates that Byrd's chronological age of nineteen does not accurately reflect his maturity." *State v. Byrd*, 512 N.E.2d 611, 626 (Ohio 1987) (Brown, J., concurring).

counsel. However, in this case – on these facts – the failure even to challenge such serious and damaging prosecutorial misconduct falls far beyond the bounds of effective representation.

Likewise, Byrd's appellate counsel must be deemed ineffective for not raising, on direct appeal, trial counsel's failure to challenge the stated prosecutorial misconduct. *See, e.g., United States ex rel. Barnard v. Lane*, 819 F.2d 798, 805 (7th Cir. 1987) (finding appellate counsel ineffective for failure to raise trial counsel's ineffectiveness on direct appeal). Certainly it is not within the bounds of objectively reasonable professional conduct, or constitutionally permissible appellate strategy, to fail to raise prejudicial violations of Sixth Amendment rights.

In addition, since the prejudice analysis is essentially identical to the *Brady* materiality determination, *see Strickland*, 466 U.S. at 694; *see also Tucker v. Prelesnik*, 181 F.3d 747, 754-55 (6th Cir. 1999), for the reasons discussed previously, the failure of Byrd's attorneys to challenge the discussed prosecutorial misconduct prejudiced Byrd's right to a fair trial.

### III.

If the majority is unwilling to acknowledge the constitutional errors that appear on the face of this record, Byrd should, at the very least, be granted discovery and an evidentiary hearing to explore his claims that: 1) Armstead testified falsely concerning Byrd's role in the murder of Monte Tewksbury; 2) the prosecution intentionally failed to correct the false testimony; and 3) the prosecution actually suppressed evidence relevant to Armstead's impeachment. Since Byrd has averred facts sufficient to support *Brady* violations because the prosecution *should* have known that Armstead testified falsely, he has certainly raised sufficient facts to justify an evidentiary hearing to further substantiate his claims.

## A.

We apply a two-part test to determine whether a criminal defendant was denied effective assistance of counsel. First, we ascertain whether counsel's performance was professionally deficient; second, we determine whether the deficient performance prejudiced the defendant's constitutional interests. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Rickman v. Bell*, 131 F.3d 1150, 1154 (6th Cir. 1997); *Gravley*, 87 F.3d at 785. In assessing counsel's performance, we inquire whether "counsel's representation fell below an objective standard of reasonableness," as measured by "prevailing professional norms." *Rickman*, 131 F.3d at 1154 (quoting *Strickland*, 466 U.S. at 687-88). This objective reasonableness standard encompasses strategic litigation choices that simply fail to bear fruit. *See Strickland*, 466 U.S. at 689.

In this case, there is no objectively reasonable professional norm of capital defense practice that suggests counsel should remain mute while a prosecutor engages in egregious prosecutorial vouching and wild factual speculation. *See Gravley*, 87 F.3d at 785-86 (holding that defense counsel provided ineffective assistance by failing to object to numerous instances of prosecutorial misconduct during trial and closing argument). In a case that turns on the testimony of a jailhouse informant, it is a gross dereliction of duty for a capital defense lawyer to sit silently while a prosecutor declares that the State of Ohio "believe[s]" the testimony. It is similarly deficient representation for capital defense counsel to fail to object to outrageous prosecutorial speculation as to a defendant's purported motive in allegedly committing a murder, or the whereabouts of unrecovered key evidence. While the failure to object to apparent prejudicial error may often be predicated upon trial strategy, *see Strickland*, 466 U.S. at 689, there is no acceptable tactical justification for silence on these issues. If this case did not so indispensably depend on the testimony of one individual, the substantial deference the Constitution affords criminal defense lawyers might encompass the inaction of Byrd's

manifest itself later in life or explain his behavior on the night in question. The court concluded: "To give credence to this suggested mitigation would be an affront to the sensitivities of the thousands of law-abiding, hard-working citizens of this state who had a similar childhood and have matured to an adulthood of exemplary existence." JA at 1134. The court also disregarded Petitioner's statement during the penalty phase concerning drinking and using drugs on the night in question as being "self-serving" and "not under oath." With respect to Petitioner's alleged learning disability, the court expressly held that "[i]t should be fairly obvious to even a person of low mentality that if you bury a bowie knife to its hilt in the chest of someone, the victim may die as a result thereof, and that the perpetrator will suffer the full punishment provided by law." JA at 1134. Based on its determination that this mitigating evidence was insufficient to counteract the aggravating circumstances, the court held that death was the appropriate sentence in this case, and it directed that Petitioner be executed on January 27, 1984.

## C. Appeals

After his sentencing, Petitioner was appointed new counsel to represent him on appeal. In his appellate brief, Petitioner raised twenty separate assignments of error. On February 5, 1986, the Ohio Court of Appeals for the First Appellate District (Hamilton County) (hereinafter referred to as the Hamilton County Court of Appeals), affirmed both Petitioner's conviction and sentence. *State v. Byrd*, No. C-830676, 1986 WL 1512 (Ohio Ct. App. 1 Dist., Feb. 5, 1986). On August 12, 1987, the Ohio Supreme Court rejected essentially the same claims. *State v. Byrd*, 512 N.E.2d 611 (Ohio 1987). The state supreme court concluded that this case "involve[s] a completely compliant victim who gave Byrd no reason to stab him. We find that the death penalty is not inappropriate considering the senseless nature of the murder and the similarity to other cases in which the death penalty was upheld." *Id.* at 626. The U.S. Supreme Court denied a petition for certiorari. *Byrd v. Ohio*, 484 U.S. 1037 (1988).

While his direct appeal was still pending, Petitioner filed a motion for a new trial. Although it was filed on December 6, 1983, the motion was not ruled upon for almost six years. On September 19, 1989, the trial court denied the motion. The Hamilton County Court of Appeals subsequently affirmed this denial. *State v. Byrd*, No. C-890659, 1991 WL 17781 (Ohio Ct. App. 1 Dist., Feb. 13, 1991).

Following Petitioner's direct appeals, and while his motion for a new trial was pending, Petitioner filed a post-conviction relief petition with the Hamilton County Court of Common Pleas. The court denied a request by Petitioner to consolidate his post-conviction petition with his motion for a new trial and then denied the post-conviction petition without a hearing on October 2, 1989. On February 13, 1991, the Hamilton County Court of Appeals reversed and remanded. *State v. Byrd*, No. C-890699, 1991 WL 17783 (Ohio Ct. App. 1 Dist., Feb. 13, 1991). The court of appeals stated that the common pleas court's decision did not recite that it had reviewed the totality of the record before denying the petition. *Id.* at *2. Despite obtaining a remand from the court of appeals, Petitioner appealed the judgment of the appellate court to the Ohio Supreme Court. On May 20, 1991, the state supreme court granted the State's motion to dismiss the appeal, effective as of May 15, 1991. *State v. Byrd*, 573 N.E.2d 665 (Ohio 1991).

On April 1, 1991, the common pleas court again denied the post-conviction relief petition without a hearing. The trial court explained: "The Court of Appeals has erroneously concluded that this Court did not review the entire record when previously ruling on this case . . . . This Court did previously review the entire record, and now, pursuant to the Court of Appeals decision, has again reviewed the entire record." *State v. Byrd*, No. B-831662, at 1 (Hamilton County C.P., Apr. 1, 1991). The Hamilton County Court of Appeals affirmed this judgment on February 26, 1992. *State v. Byrd*, No. C-910340, 1992 WL 37761 (Ohio Ct. App. 1 Dist., Feb. 26, 1992). In particular, the court of appeals determined that Petitioner's ineffective assistance of appellate counsel claims

the merits of Byrd's claims, it is apparent that the bulk of them lack merit. However, given the failure of Byrd's trial counsel to object to widespread prosecutorial misconduct, *see supra* Part I, and the failure of Byrd's appellate counsel to raise issues pertaining to prosecutorial misconduct and the credibility of Armstead's testimony, it is clear that Byrd was denied his Sixth Amendment right to effective assistance of counsel.

---

of counsel in a postconviction hearing. As long as no direct appeal was taken, or the claim of incompetent counsel was not raised and adjudicated on a direct appeal, res judicata does not bar the adjudication of this issue in postconviction proceedings.

448 N.E.2d 452, 454 (Ohio 1983) (internal quotations and citation omitted). Shortly after *Cooperrider*, in an opinion seemingly applying the *Cooperrider* principle, the Ohio Supreme Court addressed the merits of an ineffective assistance of trial counsel claim, after it noted that the claim was not raised on direct appeal. *See State v. Decker*, 502 N.E.2d 647, 649 & n.3 (Ohio 1986). All of the cases cited by the majority regarding the supposed consistency and clarity of the *Cole* rule are after 1990 – well after Byrd had sought to vindicate his Sixth Amendment rights under state post-conviction proceedings. *See Ante at* ¶ 203-204. Given these ambiguous statements by the Ohio Supreme Court, we certainly cannot conclude that the *Cole* rule was sufficiently established and enforced to justify default of Byrd's claim of ineffective assistance of trial counsel. In any event, to the extent his trial counsel claim was defaulted, it is clear that the default was "cause[d]" by the ineffectiveness of Byrd's appellate counsel. *See, e.g., Gravley*, 87 F.3d at 785. Further, given that this Court has itself recognized the murkiness of Ohio's procedural framework for presenting claims of ineffective assistance of appellate counsel, *see Manning v. Alexander*, 912 F.2d 878, 881-83 (6th Cir. 1990), we cannot conclude that the *Murnahan* rule – not clearly articulated until 1992 – was sufficiently established and followed to bar our consideration of Byrd's ineffective appellate counsel claims. Thus, irrespective of the Supreme Court's resolution of *Carpenter v. Mohr*, 163 F.3d 938 (6th Cir. 1998), *cert. granted sub nom, Edwards v. Carpenter*, 120 S.Ct. 444, (U.S. Nov. 8, 1999) (No. 98-2060), Byrd's appellate ineffectiveness claims are not barred by an "adequate" state procedural bar, and therefore can properly serve as "cause" for any purported default of his trial ineffectiveness claims. Finally, as should be apparent from the following discussion of the merits of Byrd's claims, he was clearly prejudiced by the failure to receive effective assistance.

which the testimony of convicted felon and jailhouse informant Armstead can be credited; the vouching results in the presentation of Armstead as an upstanding member of the prosecutor's "our people"; the factual speculation allows for the creation of an imaginary evidentiary predicate to undergird Armstead's testimony; and the victim impact evidence predisposes the jury to grant Armstead every benefit of the doubt as it, understandably, seeks to make someone pay for the damage done to the Tewksbury family. In this context, confidence in the outcome of Byrd's trial must be, and is, seriously undermined. One cannot, in good conscience, blink at such substantial constitutional impropriety with full comprehension of its deadly effects. In these circumstances, judicial neglect transforms the justice system into an accomplice to constitutional transgression.

## II.

Byrd also claims that his trial and appellate counsel were ineffective in violation of the Sixth Amendment. Initially, I note that Byrd has not procedurally defaulted his ineffective assistance of trial and appellate counsel claims, and therefore those claims are preserved for federal review.[1] Turning to

---

[1] The majority primarily relies on the Ohio Supreme Court's decision in *State v. Cole*, 443 N.E.2d 169 (Ohio 1982) for its conclusion that Byrd procedurally defaulted his ineffective assistance of trial counsel claims. It is settled that only state procedural bars that are deemed "adequate" to support the state's judgment are given force by federal courts. *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991). This adequacy determination requires that a state procedural rule be actually enforced and "firmly established and regularly followed." *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991). On one hand, the Ohio Supreme Court concluded in *Cole* that a claim is barred by res judicata when a defendant, represented by new counsel, fails to raise on direct appeal a claim of ineffective assistance of trial counsel that can be resolved without reference to evidence outside the record. *See* 443 N.E.2d at 170. However, one year later in *State v. Cooperrider*, the Ohio Supreme Court held:

Appellant should have no fear that the doctrine of res judicata will prevent him from raising the issue of ineffective assistance

were not properly raised in a post-conviction petition. *Id.* at *6. The Ohio Supreme Court declined to hear Petitioner's appeal of the denial of his post-conviction petition. *State v. Byrd*, 596 N.E.2d 472 (Ohio 1992).

After failing to persuade the state courts to hear his ineffective assistance of appellate counsel claims in a petition for post-conviction relief, Petitioner filed an application for delayed reconsideration with the Hamilton County Court of Appeals on June 17, 1992. On October 1, 1992, the court of appeals issued an order in which it stated that it would not consider any of these claims because they were untimely. *State v. Byrd*, No. C-830676 (Ohio Ct. App. 1 Dist., Oct. 1, 1992). Following the court of appeals's refusal to hear his claims, Petitioner pursued two different courses. First, Petitioner appealed that refusal to the Ohio Supreme Court. On October 27, 1993, the state supreme court affirmed the judgment of the court of appeals in a one-sentence order. *State v. Byrd*, 621 N.E.2d 407 (Ohio 1993). Second, Petitioner filed a motion for delayed reinstatement of his direct appeal to the Ohio Supreme Court. The court denied the motion without elaboration in another entry issued on October 27, 1993. *State v. Byrd*, 621 N.E.2d 409 (Ohio 1993). Motions to reconsider both orders were denied on December 15, 1993, and the Ohio Supreme Court scheduled an execution date of March 15, 1994.

Then, on March 7, 1994, only eight days before his scheduled execution, Petitioner filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. "That formidable filing included 29 claims for relief and filled almost 300 pages." *Collins v. Byrd*, 510 U.S. 1185, 1186 (1994) (Scalia, J., dissenting from denial of the application to vacate stay of execution). The U.S. District Court for the Southern District of Ohio rejected Petitioner's habeas petition on grounds of inexcusable delay. However, we granted a stay of execution. Among other things, our order granted Petitioner "120 days to allow for further investigation and discovery of possible habeas claims," *id.* at 1187 (internal quotations omitted), as well as "leave . . . to amend the

petition within sixty (60) days of this order to include any newly discovered claims," *Id.* at 1187-88 (internal quotations omitted). Upon application by the State, the U.S. Supreme Court declined to vacate the stay. Petitioner's case was transferred to a different district court judge. On December 28, 1995, following three separate opinions disposing of the claims raised, the district court entered an order denying the petition for a writ of habeas corpus and dismissing the action. Petitioner now appeals from the district court's denial of habeas relief.

## II.  Ronald Armstead

### A.  Testimony Regarding Petitioner's Confession

The first issues that we will consider focus upon the testimony of Ronald Armstead. All agree that Armstead's testimony was vitally important to the jury's determination that Petitioner was the principal offender in the aggravated murder of Monte Tewksbury. Armstead testified that, following their arrests, Petitioner, Brewer, and Woodall were transported to Block A at the Cincinnati Workhouse where Armstead was an inmate. Armstead testified that Petitioner subsequently confessed to stabbing Monte. The following excerpts of Armstead's testimony are the most crucial:

Q [by the prosecution]: And what were some of the other questions that they asked you and talked to you about?

A [by Armstead]: Well, they was doing a lot of bragging, you know, about their case, period. Byrd (indicating) and Brewer, I talked to them in Byrd's cell. . . . He [Petitioner] was telling me about how he had stabbed that gentleman out there at the King Kwik, you know, and he wanted to be sure that they didn't, wasn't able to find any blood stains on the knife, you know. He wanted to, you know, as much information that he could get from my standpoint, how would they be able to find any blood on the knife if they cleaned it.

from jail. This videotape had little, if any, probative value respecting Armstead's testimony, and to the extent it did shed minimal light on the circumstances surrounding Byrd's purported jailhouse confession, the State certainly could have presented alternative evidence that carried less potential to inflame and prejudice the jury. One can comprehend the relevance of this kind of material during the sentencing phase where the sentencer needs to respond to "the specific harm caused by the defendant," *see Payne*, 501 U.S. at 825. But such a visceral appeal as this – with a highly attenuated connection to any material fact respecting Byrd's guilt – is inappropriate in the context of determining whether a defendant is guilty of a capital crime.

### D.

While it may be that each specific instance of prosecutorial misconduct might not *per se* warrant a new trial, taken as a whole, the cumulative effects of these improprieties certainly denied Byrd a constitutionally fair trial. *See United States v. Young*, 470 U.S. 1, 11 (1985) (holding that a prosecutor's conduct must be analyzed in context to determine if defendant denied a fair trial). In *Francis*, 170 F.3d at 552, we recently ordered a new trial despite our findings that the specific instances of prosecutorial vouching and improper factual speculation were not individually sufficient to warrant a new trial. We concluded: "[W]hen we review the numerous examples of impropriety in this case together and in the context of the entire trial, a new trial is appropriate." *Id.*; *see also Gravley v. Mills*, 87 F.3d 779, 790 (6th Cir. 1996) (granting habeas petition given numerous instances of prosecutorial misconduct).

For similar reasons, it is clear that the cumulative effect of the numerous prosecutorial improprieties in this case denied Byrd a constitutionally fair trial. The only way the majority can reach a contrary conclusion is to focus myopically on each specific instance of prosecutorial misconduct as if it occurred in a vacuum. The prosecutor's conduct, however, is symbiotic. The *Brady* violations create an environment in

of substantiation. Morever, it transforms a trial from deliberate and sober fact-finding to visceral and capricious guesswork.

Finally, the prosecutor introduced substantial victim impact evidence during the guilt phase of the trial. While the Supreme Court has recently held that such evidence is permissible during the sentencing phase of a capital trial, it has not similarly approved of such evidence during the guilt phase. *See Payne v. Tennessee*, 501 U.S. 808, (1991). Indeed, five of the six Justices in the *Payne* majority wrote or joined separate concurrences, reiterating that the Court's holding applied only to the sentencing phase of capital trials. *See id.* at 830 (O'Connor, J., joined by White and Kennedy, JJ., concurring) ("[A] state may legitimately determine that victim impact evidence is relevant to a capital sentencing proceeding."); *id.* at 833 (Scalia, J., joined by O'Connor and Kennedy, JJ., concurring) ("The Court correctly observes the injustice of requiring the exclusion of relevant aggravating evidence during capital sentencing. . . ."); *id.* at 835 (Souter, J., joined by Kennedy, J., concurring) ("To my knowledge, our legal tradition has never included a general rule that evidence of a crime's effects on the victim and others is, standing alone, irrelevant to a sentencing determination of the defendant's culpability."). While it may be true that victim impact evidence related to the underlying crime will customarily be disclosed during the guilt phase, *see id.* at 840 (Souter, J., concurring), such disclosure must be limited by its probative relevance respecting material facts. *See, e.g., Bennett v. Angelone*, 92 F.3d 1336, 1348 (4th Cir. 1996).

In Byrd's case, the prosecutor played a highly empathetic television news magazine videotape of Tewksbury and his family, during the testimony of Ronald Armstead. The videotape was played without audio so that all the jury observed were the highly-charged and undoubtedly heart-wrenching images of one who had been taken away from his family by a senseless crime. The majority asserts that the videotape was relevant to Armstead's testimony since Byrd allegedly confessed to Armstead while watching the program

. . .

Q: Let me ask you this question. Did Defendant Byrd specifically tell you that he's the one that stabbed Monte Tewksbury?

A: Yes, he did.

Q: How did he say that?

A: Okay. See, he kept on worrying, he, you know, he kept on worrying about that knife, so like he had got some stamps, so I was in the cell talking with him first and then Brewer came in and then we just started, they just started asking me questions, and he said, "Yeah, I killed him, I killed him, you know, because he was in my motherfu _ _ king way, f _ _ k him," you know. That's the whole attitude they took the whole time they were there, they don't care, you know. He [Petitioner] don't care (indicating).

Q: Did Brewer tell you who took the money?

A: Brewer took the money. He [Petitioner] stabbed him (indicating).

Tr. at 1547-52. In the district court, the Hamilton County Prosecutor's Office submitted affidavits asserting that Armstead had provided the prosecutors with details about the murder that were known only to the police and that had not been provided to the media.

## B. Petitioner's Challenges to Armstead's Testimony

On appeal, Petitioner posits several challenges to Armstead's testimony. First, Petitioner contends that either of the following is true: (1) That Armstead and the prosecution had agreed prior to the time that Armstead testified that Armstead would receive favorable consideration in an upcoming parole revocation hearing he was facing in exchange for his testimony and that Armstead testified falsely

that no such deal had been made[7]; or (2) even if no deal had been reached between Armstead and the prosecution, Armstead nevertheless testified falsely when he stated that he was not facing additional charges at the time of Petitioner's trial. Second, Petitioner alleges that Armstead's testimony about Petitioner's confession was false in all material respects. In support of his position, Petitioner presented affidavits from several individuals who were incarcerated with Armstead and Petitioner in the Cincinnati Workhouse in the Spring of 1983. Petitioner asserts that these affidavits show that Armstead and another inmate, Virgil Jordan, were involved in a scheme to testify falsely against Petitioner in order to further their own causes with the Hamilton County Prosecutor's Office.[8] Under any of these theories, Petitioner

---

[7]We note that Armstead was never asked directly whether he had received any consideration from the State in exchange for his testimony. Presumably, Petitioner is referring to the prosecutor's question on re-direct examination, which asked Armstead to "tell the Jury and Judge why you are here testifying?" Tr. at 1570.

[8]Marvin Randolph's affidavit claimed that Jordan was the originator of a plan to help himself, Armstead, Randolph, and another inmate, Paul Sargent, by concocting a story that Petitioner had confessed, using details of the robbery and murder gleaned from news accounts. Robert Jones's affidavit stated that he overheard Armstead and Jordan discussing this plan. Elwood Jones, Jr., claimed both that he had overheard Jordan and Armstead putting their story together, and that Armstead later admitted to him that Armstead had lied during Petitioner's trial and had made a deal with the prosecutor that Armstead would be released from prison if he testified. Elwood Jones also produced a letter allegedly written by Armstead that recants Armstead's testimony. A handwriting examiner in state court concluded that the letter had not been written by Armstead and that there were things about the letter which suggested that Elwood Jones had written it himself. Finally, in the district court, Petitioner submitted an affidavit from one of his post-conviction counsel. The letter claimed that Jordan had told her that he and Armstead agreed to fabricate a story concerning Petitioner's confession. However, Jordan refused to sign an affidavit to that effect.

The State, on the other hand, submitted affidavits in response. These affidavits denied the existence of any type of deal between Armstead and the Hamilton County Prosecutor's Office, and also affirmatively asserted

improper for a prosecutor to inform the jury as to purported facts not in evidence during closing argument. *See United States v. Wiedyk*, 71 F.3d 602, 610 (6th Cir. 1995) ("A prosecutor's statement in a closing argument is improper if the statement brings to the jury's attention purported facts that are not in evidence and are prejudicial."); *Bess*, 593 F.2d at 753 ("An attorney's job arguing a case before a jury is to persuade that body, based solely on the proof at trial and reasonable inferences that can be deduced therefrom."); *United States v. Gallardo-Trapero*, 185 F.3d 307, 320 (5th Cir. 1999) (holding that "a prosecutor's closing argument cannot roam beyond the evidence presented during trial").

In this case, the prosecutor engaged in wild and inexcusable factual speculation during his closing argument. Without any evidentiary predicate whatsoever, the prosecutor concluded that since Byrd's boyhood home was in the same area as the store where Tewksbury was killed, "on numerous occasions [Byrd] was face to face with Monte Tewksbury, saw him, and recognized him." J.A. at 3912. In attempting to explain why Tewksbury's blood was not found on the recovered knife, the prosecutor hypothesized -- again without any evidentiary predicate -- that Byrd had wiped the blood off the knife with a missing t-shirt sleeve and dumped the sleeve "out in Hamilton County in the northwest side with blood all over it." J.A. at 3921-22. Given that this hypothesis was wholly unsupported by introduced evidence, the prosecutor, of course, could not identify the location of the sleeve. However, he decided to take a guess at the sleeve's location anyway, speculating: "Maybe [it's in] the same place Monte Tewksbury's ring is. Maybe the same place the top of the cash register is. But that is the explanation of what happened to the other sleeve." J.A. at 3921. The majority has not identified any evidentiary predicate from which the prosecutor could reasonably infer these purported facts. There is a good reason for this omission: there is no evidence to substantiate the prosecutor's overzealous theorizing. Similar to prosecutorial vouching for witness credibility, such speculation places the government's prestige behind uncorroborated putative facts that have not survived the rigor

strikingly similar to what we see here. In that case, the prosecutor stated that he "believe[d] beyond a reasonable doubt" that the defendant committed the charged crime. *Id.* at 753; *see also United States v. Kerr*, 981 F.2d 1050, 1053 (9th Cir. 1992) (finding improper vouching when prosecutor stated, "I think [the witness] was candid. I think he is honest."). We characterized such direct prosecutorial vouching as "egregious," "astonish[ing]," and "inexcusable." *Bess*, 593 F.2d at 753, 757. There is no other way to describe the prosecutor's statements in this case. The essential question is whether this vouching constitutes reversible error.

In *Carroll*, we distilled the appropriate analysis for determining whether identified prosecutorial vouching rises to the level of reversible error. As noted above, we first determine whether the remarks at issue were flagrant. Here, the prosecutor's comments were certainly misleading to the jury. The majority does not dispute that Armstead's credibility was indispensable to Byrd's conviction. Armstead was a jailhouse informant and convicted felon whose credibility was questionable at best. The State's representations that it believed Armstead are certainly likely to mislead a citizen jury as to Armstead's actual credibility. Additionally, the import of the remarks was exacerbated by the weakness of alternative evidence of Byrd's guilt. Again, the majority does not dispute that this case turns on Armstead's credibility, which was certainly bolstered by overt prosecutorial vouching. Though the statements do not appear to be extensive, nor can we determine whether they were deliberately placed before the jury, their strategic potency is beyond dispute. Given the paucity of corroborating evidence of Byrd's guilt, and the fact that these statements were the kind that would mislead a jury, the prosecutorial vouching in this case represents flagrant constitutional error.

### C.

In addition to engaging in gross vouching during his closing argument, Byrd's prosecutor also speculated as to facts not in evidence. As the majority acknowledges, it is highly

contends that the State violated his right to due process when it presented testimony from a key witness which it knew was false and which it neither corrected nor disclosed to Petitioner's counsel. *See Brady v. Maryland*, 373 U.S. 83 (1963). Thus, Petitioner argues that we should reverse his capital conviction and vacate his death sentence.

Petitioner's third argument is an alternative one. He contends that the state courts denied him discovery and an evidentiary hearing on these claims. Therefore, Petitioner asks us, at a minimum, to vacate the district court's judgment and remand Petitioner's case with instructions that Petitioner be allowed to conduct discovery and be granted an evidentiary hearing. In order to evaluate Petitioner's claims fully, we must review Armstead's criminal status at the time of Petitioner's trial, as well as the testimony that Armstead provided at trial.

### C. Armstead's Status at the Time of Trial

### (1) Possible Parole Revocation

On December 4, 1980, Armstead began serving a 3-15 year prison sentence, which was imposed by the Hamilton County Court of Common Pleas following his convictions for felonious assault and trafficking in drugs. On September 2, 1982, Armstead was paroled, notwithstanding the opposition of the Hamilton County Prosecutor's Office, which had maintained that Armstead showed a disposition to commit violent crimes. Approximately three months later, on December 17, 1982, Armstead was arrested and charged with robbery. The Ohio Adult Parole Authority (APA) was

---

that Armstead had provided the prosecutors with details about the murder that were known only to the police and that had not been provided to the media. Moreover, the State provided letters from Randolph and Sargent, written before any contact had been made by Armstead, in which they volunteered to testify against Petitioner and in which they stated that Petitioner had admitted to various inmates at the jail that he had killed Monte.

notified of his arrest, and, by January 3, 1983, Armstead waived a probable cause hearing on the issue of whether he was a parole violator given his recent arrest and was notified that he would receive a full parole revocation hearing at a later date. On February 2, 1983, Armstead was declared a parole violator, and the APA placed a detainer on him which would result in his arrest as soon as he was released from jail on this most recent charge. On March 15, 1983, Armstead pleaded guilty to a reduced charge of assault and attempted petty theft and received a sentence of 180 days in the Cincinnati Workhouse. His presumptive release date was September 15, 1983.

While serving his 180 day sentence at the Workhouse, Armstead met Petitioner and witnessed Petitioner's confession to Monte's stabbing. Armstead testified to this effect at Petitioner's trial. Petitioner was convicted on August 12, 1983, and sentenced to death on August 19, 1983. On August 29, 1983, Armstead was released from the Workhouse and sent, pursuant to a parole violator warrant, to the Columbus Correctional Facility for further proceedings. Armstead was scheduled for an informal parole review hearing on October 20, 1983.

On the day Armstead was released to the custody of the APA, Daniel Breyer, the prosecutor in Petitioner's trial, spoke to a supervisor with the APA and advised him of Armstead's cooperation. The following day, Breyer confirmed this in writing. Breyer's letter stated that Armstead testified without inducement by the State. The letter explained that, although it would not recommend parole, the Hamilton County Prosecutor's Office nonetheless would not be opposed to a decision to continue Armstead on parole. Prior to the date of his parole hearing, Armstead allegedly faced threats and assaults from other inmates at the Columbus Correctional Facility, including Petitioner's father John Byrd, Sr. As a result, Armstead was transferred to the Hamilton County Jail on October 6, 1983. Then, on approximately October 20, 1983, the APA determined that Armstead would be returned to parole. Armstead's cooperation at Petitioner's trial was

prosecutorial vouching stems from its tendency to place the imprimatur and legitimacy of the government behind witness testimony. *See United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999). In this regard, the prohibition on government vouching is consistent with the prosecutor's role as representative of a dispassionate sovereign, not a partisan interest. *See Berger v. United States*, 295 U.S. 78, 88 (1935).

This Court applies a two-step analysis to determine whether prosecutorial vouching constitutes reversible constitutional error. First, we assess whether the statements were improper, and second, whether the impropriety was harmless. *See Carroll*, 26 F.3d at 1384-87 (6th Cir. 1994). In determining whether improper conduct was harmless, we further inquire into the flagrancy of the conduct. This flagrancy inquiry requires that we assess the following factors: whether the remarks tended to mislead the jury; were isolated or extensive; were deliberately or accidently placed before the jury; and the strength of the evidence against the accused. *See id.* at 1385, 1389; *see also Olsen v. McFaul*, 843 F.2d 918, 929 (6th Cir. 1988) (applying flagrancy factors to determine scope of prosecutorial misconduct in habeas case).

In this case, there is no doubt that the prosecutor improperly vouched for Armstead's credibility; the only issue is whether the vouching was harmless. During closing arguments, the prosecutor stated:

> I'm not sure there is honor among thieves, but I believe Armstead when he took the stand, and I believe you did, too . . . . I have heard no evidence direct or circumstantial to contradict what Armstead said. I believe him and submit that you should believe him. . . . Witnesses pay a price to testify. I never met Armstead before, but you know there's something real genuine about our people. . . .

J.A. at 3920. There is no more direct way to vouch for a witness' credibility than to assert "I believe him." In *United States v. Bess*, 593 F.2d 749 (6th Cir. 1979), we ordered a new trial in the face of prosecutorial vouching that is

witnesses who corroborated Armstead's testimony. In these ways, Armstead's parole evidence certainly satisfies the *Kyles* definition of materiality as whether "the government's evidentiary suppression undermines confidence in the outcome of the trial." *Id.* at 434 (internal quotations and citation omitted). *See also United States v. Scheer*, 168 F.3d 445, 452-53 (11th Cir. 1999) (finding a *Brady* violation when evidentiary suppression related to a key witness' testimony); *East v. Johnson*, 123 F.3d 235, 239 (5th Cir. 1997) (holding that "when the withheld evidence would seriously undermine the testimony of a key witness on an essential issue or there is no strong corroboration, the withheld evidence has been found to be material").

The imperative that we have the utmost confidence in a jury verdict is paramount when the punishment is death. We must not tolerate any reasonable doubt in discharging this duty. Here, no one disputes that the State secured Byrd's conviction as a direct result of Armstead's testimony. We know that the jury was unaware that Armstead faced up to fifteen years imprisonment, depending on the reception he received at his parole hearing. This reception would undoubtedly be warmer if he found a way to ingratiate himself with the Hamilton County prosecutor. None of these facts dictate that the jury would have necessarily reached a different verdict, but they certainly undermine confidence in its verdict. By failing to correct material testimony that it should have known was false, the State committed reversible constitutional error.

## B.

The prosecution's *Brady* violations were exacerbated by numerous other instances of misconduct – notably improper prosecutorial vouching for Armstead's credibility and the importing of facts not in evidence into closing argument. This Court has unambiguously stated its disdain of prosecutorial vouching for witness credibility. *See United States v. Carroll*, 26 F.3d 1380, 1389 (6th Cir. 1994) ("We cannot overstate the extent to which we disapprove of . . . improper vouching by prosecutors."). Our contempt for

cited as a mitigating circumstance behind the decision to return Armstead to parole. On October 26, 1983, Armstead was reinstated to parole and he moved to San Diego, California. After approximately one year of supervision in San Diego, Armstead received his final release on November 1, 1984.

### (2)  Armstead's Testimony

At the outset, we note the extensive impeachment evidence elicited from Armstead by Petitioner's defense counsel on cross-examination. Armstead conceded, among other things, the following facts on cross-examination:  (1) That he had been incarcerated in Block A of the Cincinnati Workhouse (i.e., "the maximum security part" of the Workhouse) since approximately December 20, 1982; (2) that he also had been convicted within the previous ten years of a state or federal offense carrying a sentence of more than one year in prison; (3) that he previously had used the alias "Ronald Scott" after he escaped from the Workhouse during a prior period of incarceration and fled to Chicago; and (4) while in Chicago, he got into some "trouble" (i.e. arrested for robbery), but he had a "good work record up there and everything, so when [he] went to court the Judge gave [him] some probation." Tr. at 1552-56. We also point out that defense counsel elicited from Armstead testimony in addition to that permitted by the Ohio Rules of Evidence. Ohio Evidence Rule 609 generally authorizes the admission of evidence of a conviction within ten years prior to the date such evidence's introduction is sought if the crime is punishable by imprisonment in excess of one year. Ohio Evid. R. 609(A)-(B). At Petitioner's trial in 1983, Armstead admitted that he had an "escape charge" from 1972. Moreover, although defense counsel was restricted at one point from pursuing the nature of Armstead's conviction within the preceding ten year period, counsel successfully obtained the answer (i.e., a reference to robbery) at a later point in his cross-examination.

At the conclusion of the cross-examination, the following colloquy occurred between Petitioner's counsel and Armstead:

Q:  Do you have any charges pending now?

   MR. VOLLMAN [prosecution]:  Objection, Judge. We have been over that.

   THE COURT:  Overruled.

A:  No, I don't sir.

Q:  Did you have charges pending at the time that you talked to the police and prosecutor?

A:  No, I didn't, sir.  I got my time in March the 15 and I don't have no time pending or nothing else pending.

Tr. at 1569.  On re-direct examination, the prosecution asked Armstead when he was subject for release.  Armstead stated: "I got about two more weeks before my time is up."  Tr. at 1570.  The prosecutor then concluded by asking Armstead why he was testifying.  Amstead stated:

   Because what he did is not what you would say is hip, and he think it hip, and he brags about it, him and his buddies, and Woodall and they bragged about it from the day that they come in the Workhouse until the day they left.  And he don't care about nothing . . . and he killed that man [Monte] for no reason, 'cause he had the money, and they could have left, and I don't have no more cases pending, and I come to testify against him because he was wrong.

Tr. at 1570.

On appeal, Petitioner argues that Armstead lied — and the prosecution knew he was lying yet failed to respond accordingly — when Armstead testified that he did not have any charges pending at the time of Petitioner's trial.

time pending or nothing else pending."  J.A. at 3863.  On redirect, the prosecution asked Armstead why he came to testify against Byrd.  Armstead responded, "I don't have no more cases pending, and I come to testify against him because he was wrong."  J.A. at 3864.  The majority attempts to explain the undeniable falsity of these statements by hypothesizing that Armstead must have thought that the questions referred to "criminal" charges, as opposed to his impending parole revocation hearings.  *See ante* 47-48.  First, Armstead was asked whether he had "*any* charges pending." "Any" means "any."  Armstead was not asked whether he had any "criminal" charges pending, or any other kind of charges. He was simply asked whether he had "any" pending charges. Moreover, Armstead responded that he had "nothing else pending."  There is no qualification in this statement.  By testifying that he had "nothing else pending," Armstead left the jury with the impression that he had no specific reason to fabricate testimony, and that all of his jail time was behind him.  This was patently untrue, and either the prosecution knew or should have known.

Additionally, the majority concludes that Armstead's testimony on his pending charges is immaterial since any parole records evidence would merely serve as cumulative impeachment evidence, and that Armstead had been substantially impeached by other evidence.  While Armstead's overall credibility was certainly impugned by evidence that he was imprisoned at the Cincinnati Workhouse at the time of trial, and his admission that he had committed a prior crime carrying at least a one-year prison term, none of this testimony furnished the kind of specific motivation to fabricate testimony provided by his parole status.  This evidence of a particular rationale to concoct testimony is not merely cumulative with respect to Armstead's general credibility.  Neither the district court nor the majority dispute that Armstead's testimony was principally responsible for Byrd's conviction.  Indeed, Armstead's testimony provided the only meaningful distinction between Byrd and co-defendant John Brewer, who was not charged with Tewksbury's murder.  Moreover, the State did not present any

The majority attempts to remove itself from this constitutional thicket by relying on our decision in *United States v. Clark*, 928 F.3d 733 (6th Cir. 1991), which provided that "[n]o *Brady* violation exists where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information." *Id.* at 738 (internal quotations and citation omitted). Perhaps recognizing the dubiousness of *Clark's* applicability to this case, the majority further maintains that Armstead's statements are neither false nor material for *Brady* purposes.

First, the majority attempts to excuse the prosecution's failure to correct Armstead's false and misleading testimony by asserting – as per *Clark* – that Byrd's trial counsel should have known "that Armstead was on some form of parole when he was arrested in December 1982" since he had access to Armstead's arrest records. *See ante* at 46. While, perhaps, one might expect an effective counsel to infer from Armstead's arrest history that he was likely on some form of parole at the time of his 1982 arrest, this omission is not so egregious as to excuse the prosecutor's failure to correct known false testimony. In *Clark*, we held that defense counsel should have been aware of exculpatory evidence when such evidence "was disclosed at [an] earlier detention hearing in the presence of defendant and with the opportunity for inquiry by defense counsel." 928 F.2d at 738. There was no such disclosure in this case. *Brady* most assuredly does not allow a prosecutor to stand idly by while key witnesses testify in materially false and misleading ways. Indeed, the Supreme Court recently asserted: "[T]he prosecution's responsibility for disclosing known, favorable evidence rising to a material level of importance is inescapable." *Kyles*, 514 U.S. at 438.

Perhaps recognizing that the *Clark* exception to *Brady* is inapplicable to this case, the majority maintains that Armstead's testimony was neither false nor material. The notion that Armstead's testimony was not false is simply implausible. Byrd's counsel asked Armstead, "Do you have any charges pending?" Armstead replied, "I don't have no

Petitioner points out that Armstead was facing an upcoming parole revocation hearing as a result of his guilty plea in March 1983 to charges of assault and attempted petty theft. In Petitioner's view, his defense counsel's question was not limited simply to any criminal charges Armstead might have been facing at the time, but necessarily encompassed something like a parole revocation hearing as well.

In Petitioner's state post-conviction proceedings, the common pleas court rejected Petitioner's *Brady* claims and denied his motion for a new trial. The court also set forth its factual findings with respect to the *Brady* claims. The district court presumed these findings to be correct. While these findings are fatal to Petitioner's *Brady* claims on habeas, Petitioner contends that we need not defer to these findings. We now review the findings of the common pleas court, as well as Petitioner's arguments that these findings are not entitled to deference.

### III.   State Court Factual Findings

### A.   Introduction

On September 19, 1989, the common pleas court denied Petitioner's motion for a new trial, and in so doing, made several findings of fact. On October 2, 1989, and again on April 1, 1991, the court denied Petitioner's request for an evidentiary hearing and denied his petition for post-conviction relief. In conjunction with each denial, the court made a number of factual findings. The Hamilton County Court of Appeals ultimately affirmed the denials of both the motion for a new trial and the petition for post-conviction relief. Petitioner subsequently filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. On habeas review, the district court deferred to the state courts' factual findings in rejecting Petitioner's claims. On appeal, Petitioner contends that these findings were not entitled to the presumption of correctness, because the state post-conviction proceedings did not afford Petitioner the opportunity to conduct discovery and develop the record. We disagree. After careful study of the entire record, it appears that, prior to ruling on his claims, the

state courts afforded Petitioner a significant opportunity to conduct the discovery necessary to support his demand for an evidentiary hearing. Thus, even assuming that the information Petitioner now seeks actually exists, we must defer to the state courts' factual findings, because Petitioner had an adequate opportunity in the state courts to develop the record to the extent necessary to warrant an evidentiary hearing, but he failed to do so. *See Keeney v. Tamaro-Reyes*, 504 U.S. 1, 9 (1992).

## B. Post-Conviction Proceedings in the State Courts

On April 19, 1988, the Ohio Supreme Court granted Petitioner six months to prepare and present his post-conviction case. Petitioner proceeded to seek discovery on two different fronts: one in the common pleas court, and one in the Hamilton County Court of Appeals. On July 19, 1988, Petitioner, through his post-conviction counsel Richard J. Vickers, filed a Motion for Release of Records. On August 5, 1988, the common pleas court issued what can only be described as a discovery order (hereinafter referred to as "the August 5th order").[9] It states:

It is therefore ORDERED that the Southern Ohio Correctional Facility, the Hamilton County Jail, the Hamilton County Juvenile Court and the Juvenile Detention Center, Adult Parole Authority, the Ohio Department of Rehabilitation and Corrections, University Hospital of Cincinnati, Cincinnati General Hospital, Cincinnati Children's Hospital and any other juvenile or adult, public or private organization or person, release upon request to Petitioner Byrd, his counsel or his agent any records in their possession which concern John W. Byrd.

In addition, any person or organization having any medical, psychological, psychiatric, hospital, police,

---

[9]A copy of this order is contained in the Appendix at the end of the opinion.

in the outcome of the trial." *Id.* at 434 (internal quotations and citation omitted). In this vein, "[if] there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial . . . [but] if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *United States v. Agurs*, 427 U.S. 97, 112-13 (1976).

In this case, the prosecution did not disclose star witness Ronald Armstead's parole records and pending charges. This evidence would have revealed that, at the time of Byrd's trial, Armstead had a pending parole violation hearing where he faced the probability of three to fifteen years of imprisonment. The evidence would have further revealed that the Hamilton County prosecutor's office, who so vehemently extolled Armstead's virtues throughout Byrd's trial, was adamantly opposed to any potential premature release for Armstead. Indeed, on multiple occasions prior to Armstead's testimony against Byrd, the prosecutor informed the Ohio Adult Parole Authority that it was strongly opposed to any early release for Armstead. After Armstead's testimony against Byrd, however, the prosecutor – who was involved in pursuing both Armstead's and Byrd's charges – committed an about-face, informing the parole board that Armstead would face physical harm in prison, and that he "sincerely hope[d]" that he would not be placed in such an environment. With a proverbial wink-and-nod, the prosecutor indicated that he "would not be opposed" to an early release for Armstead. J.A. at 1551-52.

While the jury was wholly unaware that, barring a fortuitous appearance at the parole hearing, Armstead was returning to prison, it did hear Armstead attest to the following: "I don't have no time pending or nothing else pending. . . . I don't have no more cases pending, and I come to testify against [Byrd] because he was wrong." J.A. at 3864. At best, these statements were misleading and left the jury with a material mis-impression of fact. At worst, these statements were patently false, which the prosecution knew, or should have known.

constitutional guarantees of due process, fundamental fairness, and effective assistance of counsel. These errors require an issuance of the writ or, at least, a remand for limited discovery. Anything less is a gross and irrevocable miscarriage of justice, as the stark and chilly choice here is between due process or death. Out of a deeply held belief that the option compelled by the Constitution is clear, I now set forth my dissenting views.

## I.

## A.

It is well settled that prosecutorial suppression of evidence favorable to an accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *see also Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995) . More specifically, due process prohibits the government from introducing testimony that it knew or should have known was false, *see Kyles*, 514 U.S. at 433, or failing to volunteer exculpatory evidence of which it was or should have been aware. *See United States v. Phibbs*, 999 F.2d 1053, 1088 (6th Cir. 1993); *Vega v. Johnson*, 149 F.3d 354, 363 (5th Cir. 1998); *see also Carriger v. Stewart*, 132 F.3d 463, 480-81 (9th Cir. 1997) (finding due process violation when prosecution failed to disclose exculpatory evidence relating to witness' history of untruthfulness and violent behavior). Moreover, government suppression of *any* evidence that is favorable to a defendant is material, and such suppression constitutes constitutional error when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 433 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).

To establish constitutional error, a defendant need not show that "more likely than not [he would] have received a different verdict." *Id* at 434. It suffices to show that "the government's evidentiary suppression undermines confidence

school and employment records related to Mr. Byrd should also release the records in their possession to Mr. Byrd, his attorneys or his agents.

*State v. Byrd*, No. B-831662A (Hamilton County C.P., Aug. 5, 1988).[10]

On October 18, 1988, Petitioner filed his post-conviction petition in state court and attached to it a number of affidavits of prison inmates alleging that Armstead's trial testimony had been concocted and was untrue. Also attached to the petition were, among other things, a letter purportedly written by Armstead implying that he had testified pursuant to a deal with the prosecutor and a letter from the prosecutor to the APA indicating that Armstead had not testified as part of any deal but that, for a number of reasons, the prosecutor did not object to the possibility of Armstead returning to parole rather than being sent back to prison for violating his parole.

Although he already obtained the August 5th order, Petitioner's post-conviction counsel prepared two broad pseudo-discovery motions, which he presented to the common pleas court on October 27, 1988 (hereinafter referred to as "the October 27th motions"). The first motion requested that the court order the Hamilton County Sheriff's Office "to turn over and advise the Hamilton County Prosecutor's Office of all information obtained during the course of their investigation of Petitioner's case." JA at 1718. The second motion requested that the court order the Hamilton County Prosecutor's Office to make a "complete copy of the entire Hamilton County Prosecutor's File on Petitioner Byrd." JA at 1721. The request stated that the court should review this material and then seal a copy for use in further post-conviction proceedings.

---

[10]In his habeas petition, Petitioner claims that he sought all available records through use of this motion; however, he relates the specifics only with regard to his attempts to obtain a copy of a victim impact statement.

The prosecutor opposed the second motion, and Petitioner stated later in his habeas petition that the common pleas court failed to hear or grant these motions.[11] Although Petitioner requested much more extensive discovery in the district court, these two motions appear to form the gravamen of Petitioner's protestations that the state post-conviction courts' findings of fact are not entitled to deference.

On December 2, 1988, the common pleas court held a hearing concerning Petitioner's request for copies of victim-impact statements, which Petitioner alleged were impermissibly given to the jury (hereinafter referred to as "the December 2nd hearing"). At that time, the prosecutor asked the court to revoke the August 5th order in its entirety and order that, in the future, if Petitioner wanted further "discovery type material, he can file a motion with this Court and this Court can consider each application on its own merits." JA at 3992. During Petitioner's response, the following colloquy took place:

Court:      Let's try to cut through a lot of things that I don't think are really important. ***What do you want? Specifically, what do you want?***

Vickers:    Your Honor, there's no case law or statutory authority.

Court:      Just answer my question. ***Specifically what do you want?***

Vickers:    We would like copies of the victim impact statement.

---

[11]Petitioner supported his *Brady* claim with the same documents used to support his other claims concerning Armstead and the prosecutor's alleged subornation of perjury. As discussed below, Petitioner's documents were insufficient to trigger an *in camera* review of the prosecutor's files with respect to any of Petitioner's claims, and it appears that the post-conviction court never conducted such a review. The court found, however, that the prosecutor did not suppress any evidence favorable to Petitioner.

---

**DISSENT**

---

NATHANIEL R. JONES, Circuit Judge, dissenting. This dissent is compelled by the majority's validation of the unpardonable constitutional improprieties present in this record. The effect of this validation is an intolerable abandonment of substantive and procedural principles deeply rooted in Anglo Saxon and American constitutional jurisprudence. Stated in its most simple form, these principles are designed to protect individual rights from constitutional shortcuts. I dissent here because rather than upholding these principles, as courts are sworn to do, a grievous breakdown has occurred.

The ultimate penalty – death – hovers ominously over this case, and this reality leads me to set forth several postulates. Democracy defends itself from anarchy by the degree it exalts process over passion. The supremacy of due process over raw emotion is even more compelling when government contemplates assuming the power to kill. Jurists most often find themselves in the cross-hairs of popular rage when confronted with constitutional infirmity in capital cases. In no other arena of civic decision-making is it more imperative that public officials operate with detachment. Judge Cranch, with unsurpassed clarity, spoke to the necessity of judicial impartiality in charged circumstances when he declared during Aaron Burr's 1807 treason trial: "The Constitution was made for times of commotion. . . dangerous precedents occur in dangerous times. It then becomes the duty of the judiciary calmly to poise the scales of justice, . . . undisturbed by the clamor of the multitude."

Examining Petitioner John Byrd's claims with the requisite judicial sobriety exposes serious and egregious instances of prejudicial error which, if uncorrected, will lead to his execution. It is beyond refutation that the State secured Byrd's death sentence in contravention of fundamental

**A P P E N D I X**

Court:     For what purpose?

Vickers:   It's our understanding that the victim impact statement went to the jury.

Court:     The victim impact statement did not go to the jury. There was no PSI requested by the defendant. That is part of the probation report, is it not? You have a complete record of what went to the jury. It's not in there, is it?

Vickers:   No sir.

Court:     I can assure you it didn't go to the jury. I can assure you the Court didn't even have a copy of it, if in fact there was one. *Is that all you're requesting?*

Vickers:   Your Honor, if I may be heard?

Court:     *Is this all you're requesting?*

Vickers:   At this time, we have another motion pending for emergency room records which has not been heard.

Court:     I'm only going to hear what's before me.

Vickers:   Yes sir. Once again, if this Court will allow me just to address Mr. Breyer's comments. Mr. Breyer asked this Court to revoke or limit its order without citing any case law or statutory authority for it to do so.

Court:     *I'm not going to revoke the entire order. I think revocation of the order would cause too much contact between Mr. Vickers and his staff and your office, [sic] and this particular Court with regard to discovery in the future, as regards that which may be*

***necessary for their post-conviction relief.
So I'm going to deny that portion of it.*** I am
not going to allow the release of any of the
materials which the Probation Department
may or may not have, because, one, the jury
didn't have that material and neither did the
Court, and I find that it has absolutely no
relevance with regard to the post-conviction
relief.

JA at 3393-96 (emphases added).  In response to a question
by Vickers, the court reiterated that it was not revoking the
August 5th order.

The State then requested that post-conviction counsel
clarify Petitioner's allegations concerning an alleged deal
between the prosecutor and Armstead.  In response, counsel
stated that the petition was clear:  Petitioner had attached the
August 30, 1983, letter from the prosecutor's office to the
APA stating that the prosecutor would not be opposed to
continuing Armstead's parole.[12]  The State responded with a
request that counsel explain in writing what the consideration
was that the prosecutor allegedly gave to Armstead.  This
colloquy followed:

Vickers:  Your Honor, I would be glad to respond to
Mr. Breyer, but we have sort of a Catch 22
situation here.  We can only supply the
documents that we have.  Until the Court
grants an evidentiary hearing we cannot
conduct the kind of discovery that we need to

---

[12]The letter stated that, despite the absence of any promise,
Armstead's testimony at Petitioner's trial had greatly assisted the
prosecution and that, because of his testimony, Armstead's safety was
now in danger.

of our Constitution.  We are confident that they do.
Accordingly, the judgment of the district court denying the
petition for a writ of habeas corpus is **AFFIRMED**.

contends that Ohio's death penalty scheme: (1) Allows for the imposition of capital punishment in an arbitrary and discriminatory manner; (2) fails to narrow the class of death-eligible defendants adequately; (3) imposes an impermissible risk of death on capital defendants who choose to exercise their right to a jury trial; (4) violates defendants' rights to due process and effective assistance of counsel by allowing presentence investigation reports or mental evaluations requested by defendants to be provided to the jury; (5) fails to provide for an adequate proportionality review; (6) fails to provide the sentencing authority with the option to choose a life sentence even if the aggravating circumstances outweigh the mitigating factors; and (7) provides an execution process that is cruel and unusual in that it offers defendants "the macabre choice" of death by lethal injection or death by electrocution. The district court rejected each of Petitioner's claims. We agree that the claims lack merit substantially for the reasons given by the district court in its opinion of July 28, 1995.

## IX.  Conclusion

In his brief, Petitioner states that "[t]his will in all likelihood be the last court to review the merits of [his] claims for relief from his capital conviction and death sentence." Petitioner's Br. at 1. Mindful of this likelihood and the finality of the sentence imposed, we have reviewed Petitioner's claims for relief with great care, as the length of this opinion plainly indicates.

The people of the sovereign State of Ohio have concluded that capital punishment is an appropriate sanction in certain circumstances. Over sixteen years ago, an Ohio jury recommended, and the trial court agreed, that Petitioner's crime warranted this ultimate sanction. Over the following decade, Ohio's state courts repeatedly affirmed Petitioner's conviction and sentence. Our task on habeas review is not to question the wisdom or propriety of capital punishment. Instead, our sole responsibility is to ensure that Petitioner's conviction and death sentence comport with the requirements

conduct in order to fully answer Mr. Breyer's question.[13]

Court:   You've made an allegation. There's certainly some basis for the allegation, sir.

Vickers:   Sir, within the context of the petition, I believe the documents show that there was contact between Armstead and the prosecutor's office. Also this cause of action does not stand alone. There are other causes of action to indicate.

Court:   Is it so difficult to put that in letter form and send it to Mr. Breyer?

Vickers:   I will do my best to respond, yes, sir.

JA at 3999. It is unclear to what extent, if any, counsel followed through with the court's directive to respond in writing to the prosecutor's office. Other than an apparent request for the Sheriff's investigatory records, which Petitioner eventually received, we find nothing in the record to indicate that Petitioner ever requested to view non-work product prosecutorial materials, or, if he did make such a request but was met with prosecutorial opposition, that Petitioner took any steps to have the court enforce the request.

---

[13] It appears that counsel had a preconceived notion that, since Ohio Rev. Code § 2953.21 does not *entitle* a petitioner to discovery, he was somehow precluded from pursuing discovery under the August 5th order that the court had issued in response to his motion. There is, however, an important distinction between having no entitlement to discovery and being precluded from undertaking discovery; here, although counsel may not have been able to conduct depositions or serve interrogatories without a further order from the court, he certainly could have obtained documentary materials. Counsel made a similar "we-need-an-evidentiary-hearing-to-do-discovery" statement earlier at the December 2nd hearing and in his memorandum in support of the second October 27th motion.

Just prior to participating in the above-described hearing, on November 29, 1988, Petitioner requested from the Hamilton County Sheriff's Office records pertaining to the visitation at the Hamilton County Jail and the Workhouse of inmates Armstead, Virgil Jordan, Marvin Randolph, Robert E. Jones, and Thomas Sargent. On December 23, 1988, pursuant to Ohio Rev. Code § 149.43, Petitioner filed with the Hamilton County Court of Appeals a mandamus action seeking to enforce his public records request. *State v. Leis*, No. C-880792 (Ohio Ct. App. 1 Dist., June 16, 1989). Sometime after Petitioner filed the mandamus action, the court of appeals stayed the post-conviction proceedings in the trial court.

On January 17, 1989, counsel for the Sheriff's Department wrote Petitioner's counsel and informed him that he could have access to visitation records by contacting Milt Casias at the Hamilton County Sheriff's Office. Petitioner's counsel did not examine these records until April 4, 1989. At that time, counsel was permitted to review, and was given copies of, visitation cards for each inmate whose records he requested. The search for these records had been conducted in late 1988 when Petitioner first made his request, and the Department of Corrections provided Petitioner with all of the requested visitation records that it could locate. However, not all of the records were found. In particular, the Department was unable to locate the general attorney log book for the requested period, but Milt Casias averred that, to the best of his knowledge, the log book had not been destroyed.[14] Petitioner's counsel requested, and Casias agreed to conduct,

---

[14] When Casias spoke with Petitioner's counsel on April 4, 1989, he informed counsel that the Sheriff's Department regularly destroyed records that were more than five years old. In Petitioner's case, the records sought were from spring and summer of 1983; Petitioner made this request on November 29, 1988, shortly past the five-year mark. Moreover, as the State noted, it is surprising that any visitation records were found: visitation records are supposed to be maintained on a three-year retention cycle, and individual inmate visitation cards are normally kept for only one year. Despite the foregoing, Petitioner's counsel was able to obtain visitation cards for each inmate requested.

777 (6th Cir. 1987). In any event, the claim is without merit. On direct appeal, the Ohio Supreme Court noted that, although it believed the argument to be improper, it was not prejudicial to Petitioner when viewed in the context of the entire closing argument, which emphasized the evidence of aggravating circumstances present in the case. *See State v. Byrd*, 512 N.E.2d 611, 616 (Ohio 1987). This circuit has noted that, "[u]nless calculated to incite the passions and prejudices of the jurors, appeals to the jury to act as the community conscience are not per se impermissible." *United States v. Solivan*, 937 F.2d 1146, 1151 (6th Cir. 1991). *Solivan* involved comments by the prosecutor that the jury should convict the defendant of drug charges in order to send a message to drug dealers that they were not welcome in the community. That case was in the context of a direct appeal where the court, under its supervisory powers, held that the argument constituted reversible error. Petitioner's case is distinguishable not only because we must examine his claims under the more stringent standards applicable on habeas review, but also because the argument complained of does not ask the jury to send a message to other potential murderers or robbers. The prosecutor quoted from the Supreme Court's explanation of the purpose of capital punishment as a way of arguing that the jury should find that these purposes would be served by imposing the death penalty on Petitioner. It is not clear that this comment was even improper, and it certainly does not render Petitioner's entire trial fundamentally unfair. The prosecutor urged the jury to weigh all the aggravating circumstances against the mitigating factors in making its sentencing determination. In short, the prosecutor's comments did not deny Petitioner his right to a fair trial.

For the foregoing reasons, we reject each of Petitioner's claims of prosecutorial misconduct.

### VIII. Miscellaneous Claims

Finally, Petitioner raises a series of miscellaneous challenges to Ohio's capital punishment scheme both on its face and as applied to his case. In particular, Petitioner

intelligence, interest and bias, if any; together with all the facts and circumstances surrounding the testimony. Applying these tests, you will assign to the testimony of each witness such weight as you deem proper.

You are not required to believe the testimony of any witness merely because that witness was under oath. You may believe or disbelieve all or any part of the testimony of any witness. It is in your province to determine what testimony is worthy of belief and what testimony is not worthy of belief.

Tr. at 1692-94. The remarks in question were extremely isolated and constituted only two brief comments in the midst of over thirty pages of transcript from closing argument. The comments were deliberate in the sense of attempting to emphasize the credibility of Armstead, but they clearly were not deliberate in the sense of attempting to mislead or confuse the jury. Indeed, the prosecutor explicitly told the jury that his closing argument was not evidence. Following our examination of all the factors, especially the fact that the comments did not have any substantial likelihood of confusing the jury, we conclude that the two brief comments at issue did not render Petitioner's conviction constitutionally infirm under the stringent standard applicable on habeas review. *See Brecht v. Abramson*, 507 U.S. 619, 623 (1993) (harmlessness standard used by federal habeas courts is whether the error had a "substantial and injurious effect or influence in determining the jury's verdict.") (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

### E.  Appeal to Societal Duty

Petitioner's final claim is that the prosecutor argued to the jurors during closing arguments at the sentencing phase that they should impose the death penalty on Petitioner in order to fulfill their societal duty. In making this argument, the prosecutor quoted from *Gregg v. Georgia*, 428 U.S. 153 (1976). At the outset, we note that Petitioner did not raise this claim in the petition for habeas corpus, and, thus we need not consider it on appeal. *See Chandler v. Jones*, 813 F.2d 773,

a further search for the records in question. On April 7, 1989, Casias's office informed counsel that a large number of records had, in fact, been destroyed on March 8, 1989. The Sheriff's Office provided counsel with a list of destroyed items; this list did not include any visitation records or the attorney log book. The prosecutor's office informed counsel that they would continue to look for the log book.

Counsel apparently also asked the prosecutor to provide access to the sheriff's investigatory files, a request substantially similar to the first of Petitioner's two October 27, 1988, motions. On May 10, 1989, the prosecutor's office informed counsel that, in order to expedite Petitioner's mandamus action, the prosecutor's office had "decided to make available to [Petitioner] all the records [Petitioner had] requested."[15] JA at 564. The prosecutor provided counsel with a contact at the Hamilton County's Sheriff's Office from whom counsel could obtain the requested information. In addition, through the discovery process, in January 1989, counsel obtained Petitioner's Juvenile Court records.

Sometime after April 7, 1989, Petitioner moved the Hamilton County Court of Appeals to hold an evidentiary hearing regarding the lost visitation records. The Sheriff's Department moved to dismiss the action and opposed the evidentiary hearing, providing affidavits and other documents showing that it had complied with Petitioner's mandamus request. On June 16, 1989, the Hamilton County Court of Appeals dismissed the mandamus action, stating that Petitioner "has failed to show, pursuant to Civil R. 26(B), the relevancy of the destroyed or lost records as to the Postconviction Relief Petition." JA at 3283. The court also overruled the motion for an evidentiary hearing, and dissolved the stay and protective orders previously entered.

---

[15]According to the State's April 15, 1994, opposition to Petitioner's motion for discovery in the district court, this request covered the entire file of the sheriff's investigation into Monte's murder.

We find nothing in the record to indicate that Petitioner's counsel otherwise utilized the August 5th order or Ohio Rev. Code § 149.43 to pursue further discovery. Counsel claims that, on an undisclosed date, he met with an employee of the Ohio Auditor of State to discuss a "Furtherance of Justice Account" and was informed that the Hamilton County Auditor's Office would have audit oversight responsibility for the prosecutor's disbursements from such an account. There is no indication whatsoever that, after receiving such information, counsel either attempted to obtain these records from Hamilton County or pursue a public records action.

### C. State Court Findings

In reviewing the motion for a new trial, the common pleas court considered the affidavits and other evidence attached to the post-conviction petition. The court denied the motion, finding:

(1) The affidavits and statements of Elwood Jones, and the affidavits of Marvin Randolph, Robert Jones, and Thomas Sargent are merely impeaching in nature.

(2) Elwood Jones, Marvin Randolph, Robert Jones, and Thomas Sargent are all convicted felons, whose credibility is thereby diminished. The affidavits of Randolph and Sargent are contradicted by their own letters to the prosecutor.[16]

---

[16]Thomas Sargent and Marvin Randolph each contacted the prosecutor's office via handwritten letters and affirmatively asserted that they frequently talked with Petitioner and his co-defendants and that they had information regarding Monte's murder. "Recanting affidavits and witnesses are viewed with extreme suspicion by the courts." *Spence v. Johnson*, 80 F.3d 989, 997 (5th Cir. 1996) (quoting *May v. Collins*, 955 F.2d 299, 314 (5th Cir. 1992)).

reexamine Armstead's testimony was to reevaluate Armstead's credibility. Everyone involved with the case presumably knew that, if Armstead's testimony was believed, then Petitioner was the principal offender and guilty of the cold-blooded murder of Monte Tewksbury.

In our view, the prosecutor's statements did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (internal marks and citation omitted). We are confident that the prosecutor's statements did not confuse or improperly influence the jury, especially given its decision to have the testimony reread. In addition, the trial judge instructed the jury as to the factors to consider in evaluating the weight to give the testimony of a witness. These factors emphasized that it was within the jury's sole discretion how much weight to give testimony, and the prosecutor's opinion as to the truthfulness of a witness was not one of these factors to consider. The judge instructed the jury as follows:

In determining the weight to be given to such a witness's testimony, you may take into consideration that witness's skill, experience, knowledge, veracity, familiarity with the facts of the case, and the usual rules for testing credibility.

As to all the evidence, you, ladies and gentlemen, are the sole judges of the facts, the credibility of the witnesses, and the weight to be given to the evidence.

To weigh the evidence, you must consider the credibility of the witnesses who have testified. You will apply the tests of truthfulness which you apply in your daily lives.

These tests include the appearance of each witness upon the stand; the manner of testifying; the reasonableness of the testimony; inconsistencies, if any, in the testimony; the opportunity the witness had to see, hear and know the things concerning which that witness testified; accuracy of memory; frankness or lack of it;

relief on the basis of improper vouching.[43] The few cases in which vouching provided a basis for relief were in the context of a direct appeal where we exercise supervisory power over the federal trial court proceeding. Even on direct appeal, however, reversal is not automatic. Compare *United States v. Carroll*, 26 F.3d 1380, 1390 (6th Cir. 1994) (finding reversible error), with *Collins*, 78 F.3d at 1039-40 (holding that improper vouching was harmless under the circumstances).

In Petitioner's case, we conclude that the demanding standard for habeas relief has not been met. Our review of the "totality of the circumstances" convinces us of this. *Angel*, 682 F.2d at 608. First, the above remarks did not mislead the jury at all. In fact, the prosecutor told the jury during his closing argument that his argument was not evidence. He stated, "I ask you to bear in mind what I say is not evidence." Tr. at 1643. In addition, the trial judge instructed the jury immediately after closing arguments that the arguments of the attorneys were not evidence. Tr. at 1688. This Court has noted that where the court instructs the jury in this fashion, "[s]uch instructions have sometimes been deemed to cure improprieties in closing argument." *Carroll*, 26 F.3d at 1389 n.12. Moreover, following an initial period of deliberation, the testimony of Armstead was reread at the jury's request. After hearing Armstead's testimony again, the jury returned a verdict of guilty approximately one hour later. Armstead's testimony was far from complicated. The crux of his testimony was that Petitioner told him that Petitioner had stabbed Monte. The jury could not have wanted to reexamine Armstead's testimony for the purpose of remembering what he said. Rather, the likely purpose behind the jury's desire to

---

[43] *See, e.g., Toney v. Anderson*, No. 96-4284, 1998 WL 68919 (6th Cir. Feb. 13, 1998); *Martin v. Rivers*, No. 95-2210, 1997 WL 49067 (6th Cir. Feb. 3, 1997), *cert. denied*, 520 U.S. 1233 (1997); *Boyle v. Brigano*, No. 93-3823, 1994 WL 242392 (6th Cir. June 2, 1994); *Cantrell v. Gray*, No. 84-3686, 1986 WL 16540 (6th Cir. Feb. 7, 1986); *Mitchell v. Ravitz*, No. 85-1029, 1985 WL 13742 (6th Cir. Sept. 30, 1985) (all cases denying habeas relief despite the petitioner's claim of improper vouching).

(3)　The note purportedly signed by Ronald Armstead, attached to the affidavits of Elwood Jones, was not written by Ronald Armstead.[17]

(4)　There is no credible evidence before the Court that Ronald Armstead lied in his trial testimony.

(5)　Ronald Armstead was not given any consideration by the State for his testimony against John Byrd, Jr.[18]

(6)　The credibility of Ronald Armstead was the subject of extensive cross-examination at trial.

JA at 4201-02. The court gave res judicata effect to these findings of fact when Petitioner raised identical claims in his post-conviction petition. It found that all issues of fact could be resolved without an evidentiary hearing and granted summary judgment to the State.

---

[17] The State presented a report by a handwriting expert that concluded: "I have found no basis for believing that the 'Ronald Armstead' signature on the [letter implying that Armstead cut a deal in exchange for his testimony] was written by Ronald Armstead. I am confident examination of the original would result in a definite determination that it was not written by him." JA at 3165. While not definitively so concluding, the report also indicated that the letter in question may have been written by Elwood Jones.

[18] Other than the letter that the common pleas court determined was forged, all correspondence from Armstead to the prosecutor's office was written after Petitioner's conviction and stated only that Armstead felt that his life was now in danger and was requesting the prosecutor's help. All correspondence from the prosecutor's office to the APA was also written subsequent to Petitioner's conviction. This correspondence advised, among other things, that Armstead had provided assistance, Armstead's life appeared to be in danger because of this assistance, and the prosecutor's office would not oppose continuing Armstead's parole. Prosecutor Breyer also averred that Armstead was not given a deal in exchange for his testimony and that Armstead served his local time in full before being transferred to the State as a parole violator. The inmate affidavits are the only submissions tending to support Petitioner's contention that Armstead made a deal in exchange for his testimony.

In addition, in its order denying the post-conviction petition to vacate Petitioner's sentence, the common pleas court found, among other things, that:

(1)   Marvin Randolph and Thomas Sargent initiated contact with the prosecutor's office to testify against Petitioner, but were not called by the State.

(2)   Petitioner has submitted no credible evidence suggesting that Ronald Armstead lied, or that would result in the probability of a different outcome at a second trial.

(3)   Ronald Armstead did not have any charges pending at the time of this trial,[19] and received no bargain or deal from the State in return for his testimony.

(4)   There are no fundamental discrepancies between the testimony of Ronald Armstead at this trial and his testimony at the trial of the co-defendants.

(5)   No evidence favorable to the defendant was suppressed by the State.

JA at 1874, 1878, 1896.

The Hamilton County Court of Appeals affirmed the lower court. *Ohio v. Byrd*, No. C-910340, 1992 WL 37761 (Ohio Ct. App. 1 Dist., Feb. 26, 1992). The court of appeals noted that "[u]nder O.R.C. § 2953.21(C), the trial court has a statutory duty before granting [an evidentiary] hearing to determine from the petition, the supporting affidavits, and the

---

[19]Although the common pleas court did not explicitly state that "Armstead did not lie about his charges" when discussing this claim, this is the clear import of its findings. The court explicitly found that Armstead had no criminal charges pending at the time of trial and that he served his six month sentence and was transferred to the State as a parole violator. The court concluded that Petitioner was not entitled to relief because "the factual premise underlying his claim is false." JA at 1878-79.

---

Armstead's testimony. Specifically, Petitioner complains of the following two statements:

[Armstead] looked Byrd right in the face. He looked me in the face. He looked you in the face, Armstead did, he looked the defense attorneys in the face and he said, "What that man did was wrong. He killed that man for no reason." I'm not sure there is honor among thieves, but I believe Armstead when he took that stand, and I believe you did, too.

Tr. at 1658-59.

Armstead said that he was told by Byrd that Byrd stabbed Monte Tewksbury. I haven't heard any evidence to contradict that. I have seen a lot of circumstantial evidence to support that. I have heard no evidence direct or circumstantial to contradict what Armstead said. I believe him, and I submit that you should believe him.

Tr. at 1662. Petitioner contends that these comments deprived him of his right to a fair trial and an impartial jury determination of his guilt. We have stated that "'it is improper for a prosecuting attorney in a criminal case to state his personal opinion concerning the credibility of witnesses or the guilt of a defendant.'" *United States v. Krebs*, 788 F.2d 1166, 1176 (6th Cir. 1986) (quoting *United States v. Daniels*, 528 F.2d 705, 709 (6th Cir. 1976)).

However, we lack supervisory power over state courts, and our inquiry on habeas review is limited to determining only whether the improper comments constitute a due process violation. *See Cook v. Bordenkircher*, 602 F.2d at 119 n.5. As we noted earlier, in a due process analysis, we consider "the fairness of the trial, not the culpability of the prosecutor." *Pritchett*, 117 F.3d at 964 (quotation marks and citation omitted). We have not discovered, nor have the parties directed us, to any cases in which we have granted habeas

remarks were relatively isolated, and other evidence of Petitioner's guilt is strong, especially his confession to Armstead. Although the comments were deliberately placed before the jury, the prosecutor was merely speculating about *possible* inferences from the evidence. Finally, defense counsel did not object to these comments or ask for a curative instruction. In sum, we hold that these comments were not "so egregious so as to render the entire trial fundamentally unfair." *Pritchett*, 117 F.3d at 964.

Petitioner also complains that the prosecutor directed personal insults at him and suggested that the defense counsel was hiding something from the jury. The prosecutor referred to Petitioner as a "predator" three times during closing arguments and suggested to the jury that the defense counsel was trying to hide something from it about the source of blood found on a sweater alleged to have been worn by Woodall. Although "gratuitous insults" of the defendant by a prosecutor are not to be encouraged, the prosecutor's use of the term "predator" to describe Petitioner did not deprive him of a fair trial. *See Olsen v. McFaul*, 843 F.2d 918, 930 (6th Cir. 1988) (denying habeas relief and holding that the petitioner defendant had not been deprived of a fair trial where the prosecutor referred to the petitioner as a "deadbeat," "thief," "creep," and "liar", the remarks were deliberate and not isolated, no curative instruction was given, and the evidence of guilt was not overwhelming). In addition, while it is "unprofessional . . . to make personal attacks on opposing counsel," *Collins*, 78 F.3d at 1040, the statement about defense counsel in this case was clearly a suggestion of a reasonable inference to be drawn from defense counsel's presentation of evidence and argument. "Where there is conflicting testimony, it may be reasonable to infer, and accordingly to argue, that one of the two sides is lying." *Id.* (citing *United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991)).

Finally, Petitioner argues that during closing arguments the prosecutor improperly vouched for the truthfulness of

record whether there are substantive grounds for relief." *Id.* at *2. In particular, it found that the lower court properly refused to hold an evidentiary hearing on Petitioner's first cause of action (substantive lying) because "the record is devoid of any evidence that the prosecution had any knowledge that Armstead's testimony was fallacious. Instead, Petitioner offered evidence that served only to challenge the credibility of Armstead as a witness for the state." *Id.* Similarly, the court held that, with respect to the question of a deal, there was no issue of fact that required a hearing. The court reasoned that (1) even assuming the "forged letter" was authentic, it was inherently contradictory because it stated that Armstead testified "only" because of a deal, and then later stated that he testified "only" because he wanted the truth to come out; (2) that the letter written by Prosecutor Breyer did not recommend any particular action and clearly stated that Armstead's cooperation was attained without promise or inducement; (3) Elwood Johnson's affidavit did not claim any firsthand knowledge of a deal; and (4) the record contained no other evidence of a deal. Thus, an evidentiary hearing was not required, because Petitioner failed to present sufficient evidence to create an issue of fact that, if resolved in Petitioner's favor, would provide substantive grounds for relief.

### D.  District Court Habeas Proceedings

The district court deferred to the state courts' factual findings,[20] but not until after it considered Petitioner's several

---

[20] The district court presumed that the state courts' findings were correct with respect to the "absence of any advance arrangement between Armstead and the prosecutor for leniency, and the absence of any evidence that the prosecution was aware that Armstead's testimony about Byrd's confession was false." *Byrd v. Collins*, No. C-1-94-167, at 21 (S.D. Ohio Dec. 26, 1995). It is unclear whether, in dismissing Petitioner's "pending charges" claim, the district court relied on the state courts' various findings that Armstead did not have any criminal charges pending and did not perjure himself, or whether it relied on its own factual findings with respect to that issue. Nonetheless, the court apparently concluded that Armstead's testimony was not false or

discovery requests and ordered further discovery in two areas.[21]

Among other things, Petitioner's document requests included: (1) "All documents . . . received or prepared by the Hamilton County Prosecutor's Office or the Hamilton County Sheriff's Department authorizing, requesting[,] directing or identifying Ronald Armstead, Virgil Jordan, Marvin Randolph, Robert Jones, Leroy Tunstall, to be questioned and/or investigated in connection with the murder of Monte Tewksbury, regardless of whether such individuals testified at trial"; (2) all documents containing statements by Sharon Tewksbury concerning the murder of Monte Tewksbury; (3) all Prosecutor's Office and Hamilton County Auditor's Office documents concerning payments from a "Furtherance of Justice Account," allegedly maintained by the Prosecutor's Office, to Virgil Jordan, Ronald Armstead, or any other person designated by the prosecutor as having provided assistance in the investigation of Monte's murder or Petitioner's capital trial; (4) all Sheriff's Department, Cincinnati Police Department, and Prosecutor's Office documents relating to Armstead's arrest in December 1982, and his subsequent prosecution; (5) all APA, Probation Department, and Prosecutor's Office records pertaining to Armstead's pending parole revocation; and (6) all Sheriff's Department and Prosecutor's Office records relating to the use of Armstead or Jordan as jailhouse informants.

Petitioner's deposition requests included, among others: (1) Prosecutors Breyer and Vollman, "regarding the investigation, including the review of files and internal documents

---

misleading such that the prosecutor would be required to correct it; instead it faulted defense counsel for failing to ask obvious questions concerning Armstead's supervised release status.

[21] After an April 11, 1994, hearing and subsequent briefing, the district court denied without prejudice Petitioner's original discovery motion, because it was made before filing of either Respondent's return of writ or Petitioner's traverse.

pants, you have seen them all that they were all blue. I speculate that that tan he wore, he had tan pants. I will tell you this, Nitz wasn't concerned with what color pants he had on, and he is trying to help the police. He made a mistake. He's a kid, lucky to be alive today, given that one fault, that faulty recall.

Tr. at 1655.

[W]e are missing two sleeves there (demonstrating). We have this T-shirt altered, missing one sleeve, one of them dirtier than the other, and we recovered two sleeves from that truck, one a little cleaner than the other, and I submit to you we are missing a sleeve, and I will tell you where that sleeve is. It is out in Hamilton County in the northwest side with blood all over it. Now, where out there? I don't know. Maybe the same place Monte Tewksbury's ring is. Maybe the same place the top of that cash register is. But that is the explanation as to what happened to that other sleeve.

Tr. at 1660-61. In our view, these statements constitute arguably reasonable inferences from the evidence presented at trial. The prosecutor did not present these statements as factual assertions but, rather, as beliefs inferred from the evidence presented. For example, in stating that Petitioner possibly had been in the store previously and recognized Monte, the prosecutor emphasized that the jury could *assume* that Petitioner had seen Monte before, because the store was near Petitioner's boyhood home.

However, even if the statements in question are considered impermissible comments on facts not in evidence, we conclude that they do not meet the stringent standard for obtaining habeas relief set out above. We find that the remarks did not mislead the jury, because the prosecutor qualified the remarks with statements such as "you would have to assume," "I speculate," and "where out there? I don't know." The jurors would know that these comments were inferences, and they would not be confused into believing that these comments were factual evidence. Moreover, the

assertions by Petitioner that the prosecutor commented on matters not in evidence, directed personal insults at Petitioner, suggested to the jury that defense counsel was attempting to mislead the jury, and vouched for the truthfulness of Armstead as a witness. We address each one in turn.

It is improper for a prosecutor, during closing arguments, to bring to the attention of the jury any "purported facts that are not in evidence and are prejudicial." *United States v. Wiedyk*, 71 F.3d 602, 610 (6th Cir. 1995) (citing *United States v. Leon*, 534 F.2d 667, 679 (6th Cir. 1976)). However, prosecutors "must be given leeway to argue reasonable inferences from the evidence." *United States v. Collins*, 78 F.3d 1021, 1040 (6th Cir. 1996). The statements of the prosecutor which Petitioner challenges involve speculation regarding the clothing that Petitioner was wearing on the night of the murder, the possible disposal of evidence that the State never obtained, and the possibility that Petitioner recognized Monte because Petitioner had been in the store prior to the night of the murder.

In particular, the prosecutor made the following statements:

Ironically, possibly, but more probably intentionally, this King Kwik and that intersection were about a block away, as Officer Baker said, Detective Baker said, a block away from Byrd's boyhood home, a home where I believe you would have to assume, and you can have that map, but I think you would have to assume, giving all the close nature and location of that subdivision, a home where Byrd, I'm sure, on numerous occasions was face to face with Monte Tewksbury, saw him and recognized him.

Tr. at 1649.

Now, also you heard Nitz' testimony, 18 or 19 year old kid, primarily; I think he was that old. I'm not even that sure. He didn't look that old. He was playing a video game before midnight. You heard him say that the guy with the knife had tan pants. To be in that group, had tan

maintained by the prosecutor's office pertaining to Ronald Armstead, as well as interviews of Ronald Armstead, Virgil Jordan, Marvin Randolph and Robert Jones by investigators" from the Sheriff's Department and Prosecutor's Office, and "interviews and preparation of Ronald Armstead by Daniel J. Breyer, Carl Vollman and all other Assistant Hamilton County Prosecuting Attorney's that led to" Armstead's testimony; (2) Nancy Rankin and Andrew Hitz, regarding the victim impact statements; and (3) Anderson Resnick,[22] regarding the name of the prosecutor who prosecuted Armstead in relation to his December 1982 arrest.

On October 12, 1995, the district court ordered the State to supplement the record with all records from the APA that were related to the revocation of Armstead's parole in 1983 and the release of Armstead either from parole or from the sentence which he began to serve upon parole revocation. The State complied with this request by providing its entire file on Armstead, which consisted of 147 indexed exhibits comprising 225 pages. The district court also ordered the State to produce a copy of the victim impact statement. Each party was then to submit briefs addressing (1) whether, assuming that the victim impact statement went to the jury, such submission was harmless error; and (2) whether an inference could be drawn from the parole records that Armstead testified falsely concerning his future incarceration, and, if so, whether an inference could be drawn that the prosecutor was aware of such false testimony. The court deferred its decision on the materials requested in the balance of the discovery motion. The State provided a copy of the statement, and on November 28, 1995, Petitioner deposed Nancy Rankin and Andrew Hitz.

After reviewing these records, the district court addressed in its third opinion the facts relevant to the parole issue. We have already recounted these. *See supra* at pp. 15-16. The

---

[22] Anderson Resnik was a paralegal employed by the Ohio Public Defender's Commission who attempted to find out the name of Armstead's prosecutor.

district court found that the presumption of correctness applied to the state courts' factual findings. The court first noted that the common pleas court was a court of competent jurisdiction, Petitioner and the State were parties to the post-conviction proceedings, and written, factual findings were made. *See* 28 U.S.C. § 2254(d). Citing *Sumner v. Mata*, 449 U.S. 539, 597 (1981), and *Nichols v. Perini*, 818 F.2d 554, 557 n.3 (6th Cir. 1987), the court flatly rejected Petitioner's contention that, unless the state court held an evidentiary hearing, there had been no "hearing" for purposes of determining whether the state courts' factual findings are entitled to deference under 28 U.S.C. § 2254(d). The court further concluded that none of the eight exceptions listed in § 2254(d) were applicable.[23] Using the state courts' factual findings, the district court held that the prosecutor did not

---

[23] The district court must defer to the factual findings of the state courts unless one of the following exceptions applies:

(1) the merits of the factual dispute were not resolved in the State court hearing;
(2) the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;
(3) the material facts were not adequately developed at the State court hearing;
(4) the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;
(5) the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;
(6) the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or
(7) the applicant was otherwise denied due process of law in the State court proceeding;
(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record.

28 U.S.C. § 2254(d).

---

to Petitioner's failure to testify.[42] While this determination is dispositive, we also note that these comments were relatively isolated, were few in number, and were not objected to by defense counsel.

During the penalty phase, Petitioner did not remain completely silent. Instead, he made an unsworn statement to the jury in which he expressed remorse for the incident but did not directly admit that he was the one who actually stabbed Monte. We agree with the district court that the prosecutor's penalty phase comment to which Petitioner now objects was a fair response to Petitioner's unsworn statement. The prosecutor was not commenting on Petitioner's failure to present sworn testimony. Instead, the prosecutor merely suggested to the jury that Petitioner's expression of remorse was "shallow," because Petitioner did not accept more complete responsibility for his actions and for Monte's death. Case law permits comments that are made in response "to the argument and strategy of defense counsel." *Butler*, 686 F.2d at 1172; *see also Lockett v. Ohio*, 438 U.S. 586, 595 (1978) (holding that the prosecutor's closing remarks that the evidence was "unrefuted" and "uncontradicted" added nothing to the impression that had already been created by the defendant's refusal to testify after the jury had been promised a defense by her counsel and told that the defendant would take the stand). In short, we find no constitutional violation.

## D. Various Claims of Improper Prosecutorial Argument

Petitioner also challenges various allegedly improper arguments, which he contends deprived him of a fair trial. Some of these claims, such as comments on Petitioner's failure to testify and victim impact have been addressed above. The remaining instances complained of include

---

[42] Furthermore, the comment alluding to Petitioner as a "predator" who was not "genuine" cannot reasonably be said to be a reference to his failure to testify. Nowhere in this comment does the prosecutor imply that this description of Petitioner was the result of his failure to testify.

as comments on the defendant's failure to testify, "but whether the jury necessarily would have done so." *Id.* These standards have not been met here.

As the district court noted, the comments were made during a closing argument that focused on the reasons why Armstead, a jailhouse informant, should have been viewed by the jury as a credible witness. Armstead's credibility was clearly at issue, and the prosecutor had a legitimate reason for attempting to focus on the strengths of his testimony during closing argument. Moreover, Armstead's testimony regarding the "bragging" that was done by Petitioner, Brewer, and Woodall about the murder, as well as his testimony regarding Petitioner's comments while watching *P.M. Magazine* both included references to other persons having been present. Tr. at 1560 ("they bragged to everybody over there that was in that area"); Tr. at 1563 ("Well, at the time that [the *P.M. Magazine* program] came on everybody stopped what they was doing just to watch the program"). This circuit has held that "[g]eneral references to evidence as uncontradicted, while not recommended, may not reflect on the defendant's failure to testify where witnesses other than the defendant could have contradicted the evidence." *Raper v. Mintzes*, 706 F.2d 161, 164 (6th Cir. 1983). Petitioner was not the only person who could have been called to refute the fact that Petitioner made such statements, and the prosecutor could legitimately argue that Armstead should be deemed a credible witness, because the defense failed to call any witnesses from the Workhouse to refute his testimony.[41]   Hence, we conclude that the prosecutor's comments did not constitute indirect references

---

[41]Although a prosecutor may not comment on the failure of a criminal defendant to produce evidence, the prosecutor may "summarize the evidence and comment on its quantitative and qualitative significance." *United States v. Bond*, 22 F.3d 662, 669 (6th Cir. 1994) (citing *United States v. Drake*, 885 F.2d 323, 323-24 (6th Cir. 1989)). In Petitioner's case, the prosecutor's comment that Armstead's testimony was uncontradicted was a permissible comment on the quality of the evidence presented.

knowingly suborn perjury. The court also held that, because the state courts' findings are binding, further discovery on these issues was not warranted, as it would not lead to an evidentiary hearing or other independent fact-finding.

### E.  Analysis of the State Courts' Factual Findings

"[W]e presume a state trial or appellate court's conclusions as to facts are correct unless the petitioner demonstrates by convincing evidence that the facts are erroneous under one of the eight conditions enumerated in 28 U.S.C. § 2254(d)(1-8)." *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996) (citing *Sumner v. Mata*, 455 U.S. 591, 597 (1982) (per curiam)). Petitioner has provided no evidence to establish that any of the § 2254(d) exceptions apply in his case. Therefore, we must defer to the state courts' factual findings.

On brief and at oral argument, Petitioner strenuously argued that the state courts' factual findings are not entitled to deference, because the state courts did not order discovery. Specifically, Petitioner contends:

No discovery was ordered.[24] Byrd filed motions asking the trial court to order the investigative files of the law enforcement authorities who investigated his case to be copied and incorporated into the files of the Hamilton County Prosecutor's Office and that the prosecutor's files be copied and filed with the trial court. The files of the investigators and prosecutor would have been invaluable to assess Byrd's claims of perjured testimony and *Brady* violations. The trial court refused to grant or even hear Byrd's motions.

---

[24]Of course, Petitioner conveniently forgets to mention the August 5th order.

Petitioner's Br. at 44-45.[25]   Thus, Petitioner argues, he has established the exceptions listed in 28 U.S.C. § 2254(d)(1), (2), and (6). We disagree.

Petitioner cannot show that "the merits of the factual dispute were not resolved in the State court hearing." § 2254(d)(1).  In fact, this contention is contrary to Petitioner's assertion that the state courts came to the wrong conclusions on the merits. In *Fowler v. Jago*, 683 F.2d 983 (6th Cir. 1982), we discussed the showing necessary to meet this exception.  We made clear that we defer where the findings are "sufficient to enable the district court to fulfill its obligation to determine that [the facts] are supported by the evidence and that the correct standards of law were applied." *Id.* at 989.  In the present case, the state court clearly found that there was no deal, that there was no credible evidence that Armstead lied about Petitioner's confession, and that, at the time of Petitioner's trial, Armstead did not have any pending criminal charges.  The court also specified the evidence upon which it relied.  Thus, § 2254(d)(1) does not apply. Similarly, Petitioner has failed to show either that "the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing" or that "the applicant did not receive a full, fair, and adequate hearing in the State court proceeding." § 2254(d)(2), (6).  Petitioner simply failed to provide a sufficient quantum of cogent evidence to warrant an investigation of the prosecutor's work product and other trial preparation files.

The Ohio post-conviction statute in effect at the time Petitioner was pursuing his state post-conviction remedies provided:

[25]Petitioner argues that this further discovery would have permitted him to show that Armstead's testimony was false; why prosecutors chose to have only Armstead, rather than also Randolph and Jordan, testify against Petitioner; that the prosecution knew that Armstead had a pending parole revocation hearing; and that Armstead, in fact, had cut a deal prior to testifying. As discussed below, Petitioner's fishing expedition was appropriately cut short.

It is well established that a prosecutor's direct reference to a criminal defendant's failure to testify is a violation of that defendant's Fifth Amendment privilege against compelled self-incrimination.  *Griffin v. California*, 380 U.S. 609 (1965); *Lent v. Wells*, 861 F.2d 972, 975 (6th Cir. 1988). However, indirect references on the failure to testify also can violate the Fifth Amendment privilege.  When the alleged infringements consist of such references, "a reviewing court must look at all the surrounding circumstances in determining whether or not there has been a constitutional violation." *Butler v. Rose*, 686 F.2d 1163, 1170 (6th Cir. 1982) (en banc). The court must undertake a "probing analysis of the context of the comment." *United States v. Robinson*, 651 F.2d 1188, 1197 (6th Cir. 1981).  This "probing analysis" involves the consideration of four factors:

(1) Were the comments "manifestly intended" to reflect the accused's silence or of such a character that the jury would "naturally and necessarily" take them as such;

(2) Were the remarks isolated or extensive;

(3) Was the evidence of guilt otherwise overwhelming; [and]

(4) What curative instructions were given, and when.

*United States v. Moore*, 917 F.2d 215, 225 (6th Cir. 1990) (quoting *Spalla v. Foltz*, 788 F.2d 400, 404-05 (6th Cir. 1986)).  We will begin with the prosecutor's comments regarding Armstead's testimony.

We are convinced that the statements concerning Armstead were not manifestly intended to reflect on Petitioner's failure to testify at trial, nor would the jury have understood the statements as such.  This Circuit has explained that we will not find "manifest intent" where some other explanations for the prosecutor's comments are equally possible.  *United States v. Ursery*, 109 F.3d 1129, 1135 (6th Cir. 1997).  In addition, we have made clear that the question is not whether the jury possibly or even probably would view the statements

marks and citation omitted); *Serra*, 4 F.3d at 1355. Hence, we reject this claim as well.

### C. Comments on Failure to Testify

Petitioner contends that the prosecutor violated his Fifth Amendment right against self-incrimination by making comments that allegedly pertained to Petitioner's failure to testify at trial. In particular, Petitioner complains of comments made during closing arguments at both the guilt and sentencing phases of his trial. During the closing argument of the guilt phase of the trial, the prosecutor remarked that the State's key witness, Ronald Armstead, was credible because "his testimony is uncontradicted, no one has disputed Armstead's testimony." Tr. at 1659. The prosecutor also stated that "[w]itnesses pay a price to testify." Tr. at 1682. He followed that comment with a reference to Armstead and the statement that "you know there's something real genuine about our people, not all of them, not the predator [i.e. Petitioner]." Tr. at 1682. Petitioner contends that these comments were an intentional attempt to draw his failure to testify to the jury's attention. During the closing argument at the penalty phase, Petitioner made an unsworn statement to the jury in which he stated that he was "sorry for what happened," and "sorry for Mr. Tewksbury and his family." Tr. at 1777. However, Petitioner also stated that he did not know exactly what was in his mind that night, and that he had been drinking and using drugs. Further, Petitioner admitted that he had made a "tragic" mistake. Tr. at 1778. The prosecutor subsequently described these comments as "shallow." Tr. at 1797. The prosecutor then asked the jury, rhetorically: "Did you hear from this man's mouth that he was the principal offender that plunged that weapon into Monte Tewksbury? Nothing from him, not one shread [sic]. Yet he wants to spook you that, you know, I have had this problem, that problem. That's nonsense." Tr. at 1798. Petitioner now argues that this was a reference to his failure to present sworn testimony during the penalty phase and to acknowledge his guilt as the principal offender. We disagree for the reasons explained below.

(A)  Any person who has been convicted of a criminal offense . . . claiming that there was such a denial or infringement of his rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States, may file a petition at any time in the court that imposed sentence, stating the grounds for relief relied upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief. The petitioner may file a supporting affidavit and other documentary evidence in support of the claim for relief.

.   .   .

(C)  Before granting a hearing, the court shall determine whether there are substantive grounds for relief. In making such a determination, the court shall consider, in addition to the petition and supporting affidavits, all the files and records pertaining to the proceedings against the petitioner, including, but not limited to, the indictment, the court's journal entries, the journalized records of the clerk of the court, and the court reporter's transcript. . . . If the court dismisses the petition, it shall make and file findings of fact and conclusions of law with respect to such dismissal.

.   .   .

(E)  Unless the petition and the files and records of the case show the petitioner is not   entitled to relief, the court shall proceed to a prompt hearing on the issues, hold the hearing, and make and file written findings of fact and conclusions of law upon entering judgment.

Ohio Rev. Code Ann. § 2953.21 (Anderson 1987).

It is true that, under Ohio law, courts are not required to hold evidentiary hearings in all post-conviction cases. *See Sherills v. Cuyahoga County Court of Common Pleas*, 650 N.E.2d 899, 900 (Ohio 1995). Where a petition alleges facts which, if proved, would entitle the petitioner to relief, but the

files and records of the case negate the existence of facts sufficient to entitle the petitioner to relief, the trial court may so find and summarily dismiss the petition; in so doing, however, the court should specify the portions of the files and records that negate the existence of the petitioner's alleged facts. *See State v. Perry*, 226 N.E.2d 104,105 (Ohio 1967) (syllabus para. 3).[26]  To merit an evidentiary hearing, a petitioner must submit evidentiary documents containing sufficient cogent and operative facts that demonstrate substantive grounds for relief. *See State v. Combs*, 652 N.E.2d 205, 210 (Ohio Ct. App. 1994); *State v. Smith*, 506 N.E.2d 1205, 1208 (Ohio Ct. App. 1986).  And it is true that, according to caselaw, Ohio post-conviction courts are not statutorily required to compel discovery so that a petitioner may gather evidence to prove that a hearing is warranted. *See Smith*, 506 N.E.2d at 1208.  Nonetheless, if discoverable materials supportive of Petitioner's claims actually do exist, fault for failure to obtain them almost certainly lies not with Ohio's post-conviction relief system, but rather with Petitioner's own post-conviction counsel.

On October 10, 1990, the Ohio Supreme Court held that a criminal defendant who has exhausted his direct appeals is a "person" who may avail himself of the State's public records law in Ohio Rev. Code § 149.43 in order to support a petition for post-conviction relief. *See Ohio ex rel. Clark v. City of Toledo*, 560 N.E.2d 1313, 1315 (Ohio 1990).[27]  Obtainable public records include law enforcement investigatory files. *See Ohio ex rel. Johnson v. City of Cleveland*, 603 N.E.2d 1011, 1012-13 (Ohio 1992).  Thus, this statutory procedure provided Petitioner with access to most of the records he

---

[26]A post-conviction petition may also be dismissed without a hearing where the claims raised therein are barred by res judicata. *See State v. Perry*, 226 N.E.2d 104, 106 (Ohio 1967) (syllabus para. 9).

[27]We recognize that the Ohio Supreme Court subsequently overruled *Clark* on September 15, 1994. *See Ohio ex rel. Steckman v. Jackson*, 639 N.E.2d 83, 85 (Ohio 1994) (syllabus para. 6).  However, *Steckman* obviously had no impact upon Petitioner's case.

---

introduced in the guilt phase as well. *See Black v. Collins*, 962 F.2d 394, 408 (5th Cir. 1992) (holding that victim impact argument presented during both guilt and sentencing phase did not render trial fundamentally unfair). S*ee also Bennett v. Angelone*, 92 F.3d 1336, 1348 (4th Cir. 1996) ("Thus *Payne* suggests that limited victim background evidence may be admitted — indeed, may have to be admitted — at the guilt phase of trial.").  Moreover, as the Seventh Circuit has remarked, "[w]e must recognize that the state should not be required to present . . . closing arguments that are devoid of all passion." *Williams v. Chrans*, 945 F.2d 926, 947 (7th Cir. 1991).

We have recognized that "[a] prosecutor is permitted a certain degree of latitude in summation." *United States v. Barker*, 553 F.2d 1013, 1025 (6th Cir. 1977).  In our view, it is far from clear that the statements complained of were improper at all.  In any event, even assuming the statements evoking sympathy for the Tewksbury family were improper, they do not meet the stringent standard necessary for reversal of a conviction on habeas.  The remarks were relatively isolated, were not extensive, and were only a small part of a closing argument that focused heavily on summarizing the evidence presented at trial.[40]  The prosecutor began his closing argument by asking the jurors to "bear in mind what I say is not evidence," and was intended only "to recreate . . . the scenario which I believe the evidence has indicated did, in fact, occur."  Tr. at 1643.  When combined with the instruction from the trial judge that the closing arguments were not evidence, we simply cannot hold that the prosecutor's isolated comments rendered "the entire trial fundamentally unfair." *Pritchett*, 117 F.3d at 964 (quotation

---

[40]In complaining of the prosecutor's arguments relating to the victimization of Monte Tewksbury, Petitioner only cites to a total of four pages of transcript.  The closing arguments by the prosecutor at the guilt phase comprised over 30 pages of transcript. *Cf. Rodriguez v. Peters*, 63 F.3d 546, 565 (7th Cir. 1995) (victim impact comments comprising one of 35 pages of closing argument transcript did not render trial unfair).

evidence." *Byrd v. Collins*, No. C-1-94-167, at 27 (S.D. Ohio Nov. 2, 1995). We agree. Moreover, even assuming the introduction of this videotape into evidence was improper, it surely would not rise to the level of a due process violation. Any prejudice to Petitioner resulting from the showing of this videotape would result not from the tape itself, but from the clearly admissible testimony regarding Petitioner's confession to the crime and callous remarks about his victim that were made while watching the television interview in the Cincinnati Workhouse.

Petitioner also claims that, during closing argument at the guilt phase, the prosecutor used inflammatory arguments to generate sympathy for Monte and his family. The statements complained of are as follows:

> After stripping Tewksbury of his personal possessions, his belongings, the store's belongings, and Tewksbury's pride, they stripped him of his life, his breath, and his blood.

Tr. at 1650.

> Monte Tewksbury will never see the sun. Monte Tewksbury will never feel the chill of fall. He will never watch his youngsters grow. He will never break bread with his wife . . . .

Tr. at 1679. We are unpersuaded.

The U.S. Supreme Court has held that there is no per se bar to the introduction of victim impact evidence and argument. *See Payne v. Tennessee*, 501 U.S. 808, 827 (1991). "In the majority of cases, . . . victim impact evidence serves entirely legitimate purposes. In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Id.* at 825. While *Payne* was announced in the context of the sentencing phase of a capital trial, its rationale has been applied to reject challenges to victim impact evidence

sought. Obviously, what Petitioner could not access pursuant to Ohio Rev. Code § 149.43 was work product material. However, Petitioner did use this procedure successfully to obtain visitation records from the Sheriff's Department. Moreover, the prosecutor represented that his office gave Petitioner access to all of the sheriff's investigatory files. But even if this were not the case, the process set forth in Ohio Rev. Code § 149.43 provided Petitioner with the ability to obtain such records and, given that the State has the burden of providing a public records exception, there does not appear to be any reason why Petitioner could not have requested from the prosecutor information that was not specifically compiled in reasonable anticipation of his trial or other non-work product materials. Similarly, it appears that Petitioner could have obtained records concerning the Furtherance of Justice Account. However, it appears from the record that such requests simply were never made.

Moreover, notwithstanding the lack of any statutory requirement to do so, Petitioner's post-conviction trial court provided Petitioner with other significant opportunities for discovery. From August 5, 1988, until October 2, 1989, there was a court order of record permitting him to obtain any and all records from any organization or person, public or private, "which concern John W. Byrd." *See supra* at p. 20. Although this language is quite broad, Petitioner's counsel's use of this order apparently focused primarily on obtaining the victim impact statement. At the December 2, 1988, hearing, the court repeatedly asked counsel, "What do you want?" Counsel's only response concerned the victim impact statement and a brief mention of emergency room records. Nothing else was requested. Notably, at this very hearing, the court explicitly refused to revoke that discovery order, although urged to do so by the prosecutor.

Despite the above-mentioned opportunities, Petitioner failed to produce any reliable evidence that would support his claim. Petitioner points to only one explicit limit placed on his discovery pursuant to the August 5th order; i.e., Petitioner's access to the victim impact statement. The

common pleas court denied Petitioner access to it, because (1) there was absolutely no evidence that the jury received a copy of it (as well as significant evidence to the contrary), and (2) the statement had no other relevance to the post-conviction proceedings. Notwithstanding the foregoing, the district court permitted discovery in this area, and Nancy Rankin, the custodian of the victim-impact statement, confirmed that the statement never went to the trial court or the jury.

With respect to Petitioner's requests for the sheriff's records, the record demonstrates that Petitioner was provided with the documents he sought with the exception of the attorney log book. The missing visitation information was essentially duplicative of that which Petitioner was provided. Petitioner received copies of each individual inmate's visitation card; the attorney log and other visitation records would only confirm that the information on those cards was accurate. Holding an evidentiary hearing on the matter would have been pointless, as the Sheriff's Office had conducted a search in December 1988, provided Petitioner with copies of those documents found, fully explained its document retention and destruction process, and provided proof that the missing documents were not among those destroyed on March 8, 1989. Moreover, assuming the missing documents were, in fact, destroyed at some other time, neither an evidentiary hearing nor further discovery would have resurrected them. In addition, it is noteworthy that Petitioner's failure to obtain these records before they were either destroyed or misplaced is due, in large part, to his own delay in seeking them, since he waited more than five years even to attempt to obtain them. The Sheriff's Department records pertaining to the murder investigation were made available by the Prosecutor's Office in May 1989. This more than fulfilled the first of Petitioner's two October 27th motions.

might have on them.[39] This type of questioning is not improper and certainly does not constitute prosecutorial misconduct.

The prosecutor introduced into evidence at Petitioner's trial a videotape of a television interview with Monte's family. This interview featured Monte's daughter, who was a singer. It was filmed the day before the murder, and both Monte and his wife were present and were a part of the interview. Petitioner contends that this was a "highly sympathetic and emotion-charged portrayal of the victim and the victim's family" and constitutes an improper attempt by the prosecutor to inflame the jury against Petitioner. Petitioner's Br. at 135. However, the State's key witness, Ronald Armstead, testified that, while watching this television interview in jail, he heard Petitioner confess to the crime. The district court noted that, since the videotaped interview "was the centerpiece of the arena where [Petitioner] allegedly confessed[,] . . . it was not wholly improper for the prosecutor to seek to introduce, nor for the trial judge to permit the introduction of, that

[39]In fact, when one juror responded that the evidence might affect her emotionally, the prosecutor asked whether she could still be fair and impartial, to which she answered that she could. We note the following exchange:

Q: A knife was used in this killing. Would that bother you to see or hear evidence where a man was stabbed with a knife in the side and bled to death? I know it's not a pleasant thing, but from the standpoint you couldn't be a fair and impartial juror?

A: I don't know, I think it would bother me.

Q: Mrs. Thompson, I'm not suggesting to you that it wouldn't bother you. What I'm saying to you, would the bother be such that you couldn't be a fair and impartial juror?

A: No.

Q: That's all I'm asking.

Tr. at 623 (voir dire of Juror Thompson).

emotionally charged victim impact arguments during closing arguments at the guilt phase.

Upon review of the transcripts of the voir dire questions and comments cited by Petitioner as illustrative of misconduct, it is clear that the context and purpose of these questions and comments were to ascertain whether or not the prospective juror could set aside his or her emotions and decide the case impartially. This is certainly proper. Indeed, a trial judge "retains great latitude in deciding what questions should be asked on voir dire." *Mu'Min v. Virginia*, 500 U.S. 415, 424 (1991). Hence, "[s]o long as the court ensured that the defendant or defendants had 'a fair trial by a panel of impartial, "indifferent" jurors,' reversal is not mandated." *United States v. Phibbs*, 999 F.2d 1053, 1071 (6th Cir. 1993) (quoting *Irvin v. Dowd*, 366 U.S. 717, 722 (1960)).

Petitioner cites the following question as evidence of misconduct:

Secondly, I don't know if you will be bothered by this or not. Some people are bothered by the method of death and how a person dies, and as I previously indicated, we are talking about a knife this long (indicating), about a blade that long being stuck in a man and him bleeding through his liver, and bleeding internally. Do you have a stomach for that, to listen to the coroner testify about the method of death?

Tr. at 804-05. In response to an affirmative answer, the prosecutor then asked, "You will be able to set that aside, however gruesome the details are, and get to the truth because that is what we are all here for? [,]" to which the juror answered "[y]es." Tr. at 805. This demonstrates that the prosecutor, far from trying to inflame prospective jurors against Petitioner, was attempting to determine whether the prospective jurors could remain fair and objective regardless of the emotional impact that the facts of this brutal crime

When Petitioner still failed to sustain his initial burden of proof more than a year after obtaining the August 5th order,[28] the common pleas court properly followed Ohio law and denied an evidentiary hearing. The Hamilton County Court of Appeals affirmed the trial court's conclusion that no evidentiary hearing was warranted under the statute. *See State v. Byrd*, No. C-890659, 1991 WL 17781, at *2 (Ohio Ct. App. 1 Dist., Feb. 13, 1991) (affirming denial of the motion for a new trial).

What Petitioner really wants is access to the prosecutor's work product and trial preparation files. Unfortunately for Petitioner, he failed to provide the state courts with a sufficient reason to force the Prosecutor's Office to turn over its files and conduct an *in camera* review. Such a review might have been warranted, for instance, if Petitioner had supplied Furtherance of Justice Account records showing that Armstead had received money from the State, or at least showing that Jordan had received money for testifying at the trial of Petitioner's co-defendant, Brewer. However, Petitioner's attempt to obtain such documents during the state post-conviction proceedings appears to have been feeble at best. Despite the fact that Petitioner's post-conviction counsel knew that the Hamilton County Auditor's Office would have records of the prosecutor's disbursements from

---

[28]Although he claims to the contrary, not one affidavit Petitioner presented contained any evidence within the affiant's personal knowledge. Each affiant's statement —whether it concerned the alleged deal or the alleged concocted confession—was nothing more than hearsay. All of the admissible "evidence" submitted, e.g., the "forged" letter allegedly written by Armstead, the post-trial letters from the prosecutor to the APA, and the prosecutor's own affidavit, tended to establish that no deal existed. The "Armstead" letter was internally inconsistent, was determined by a handwriting expert to be a forgery, and was not supported by any evidence authenticating it. The letters from the Prosecutor's Office, as well as the prosecutor's own affidavit, all indicated that Armstead's testimony was obtained without any promise or inducement from the State, and expressed a concern for Armstead's physical safety.

such an account, it appears that he made no attempt to obtain these documents through a public records action.

Similarly, such a court review might have been warranted had Petitioner obtained an affidavit from Jordan stating that he had conspired with Armstead to fabricate a story and had conveyed that information to the prosecutor, or that Jordan had personal knowledge that Armstead received payment or some other sort of deal in exchange for his testimony. Petitioner's attempt to provide information about Jordan via the affidavit of Jane Perry is insufficient:  like the other affidavits, it is nothing more than hearsay.  Moreover, given that Perry's alleged conversation with Jordan took place in October 1988, in the midst of Petitioner's state post-conviction proceedings, the fact that Perry's affidavit was never presented to the state post-conviction courts, and was not even made until October 1995, would cause most courts to raise at least one eyebrow.

As the district court determined, it was not unreasonable for Ohio to forbid Petitioner's access, even via *in camera* review, to the prosecutor's work product notes of conversations with informants when Petitioner had made no credible showing that those documents would contain information indicating Armstead had lied or cut a deal with the prosecutor.  To hold otherwise would in effect mandate that every time a petitioner makes an unsubstantiated allegation that his trial was constitutionally infirm, the post-conviction court must conduct an evidentiary hearing and order the prosecution's files to be opened.[29]  Given the fact that Petitioner failed to present any admissible evidence supporting his position, despite opportunities for discovery, we cannot say that the state court's factfinding procedures were unfair or that Petitioner was not afforded a fair hearing.

---

[29]Even with the expanded record including all of Armstead's parole records, Petitioner still fails to point to any evidence indicating that a deal might have existed.

aggravating circumstances outweighed any mitigating factors. Petitioner's brief cites as an example the following question: "[I]f you feel, based upon everything that you are instructed on by the law that this defendant's life should be taken in the electric chair for the incident he did on April 17, 1983, you could do it.  Is that what you are saying?"  Tr. at 259.  This question only inquired into whether the prospective juror could follow the law.  It is not intended to weed out those with any personal doubts about the use of capital punishment. The answer the juror gave, and the prosecutor's response, are telling in this regard.  The juror answered, "Yes, if the evidence warrants it [,]" to which the prosecutor responded, "That's the ground rules. . . . Whatever I talk to you about is if the evidence warrants it."  Tr. at 260.  The prosecutor was inquiring only whether the juror could follow the law. Needless to say, this is entirely permissible.  The questioning of the other jurors was similar in nature.[38]  Therefore, Petitioner's claim must fail.

### B. Victim Impact Evidence and Argument

Petitioner also argues that the prosecutor improperly injected victim impact evidence and arguments into the trial. In particular, Petitioner alleges that the prosecutor (1) made comments during voir dire about the nature and manner of the murder, (2) introduced into evidence a videotape of a television interview with the victim's family, and (3) made

---

[38]For example, one juror answered the prosecutor's question of whether she could impose the death penalty where the law merited doing so by stating that "I believe that would be my duty to do." Tr. at 963 (voir dire of Juror Hall).  The trial judge had asked her earlier whether she could fairly consider the death penalty, and she stated that it was "not simple" for her.  Tr. at 958.  In spite of these possible doubts about her views of the death penalty, the prosecutor did not challenge her being seated on the jury, because she had indicated that she could follow the law despite any personal doubts.  This demonstrates that the prosecutor was not attempting to screen from the jury everyone who had any doubts about capital punishment.  Rather, the prosecutor was merely attempting to ensure that each juror would be able to apply the law to the facts in the case.

Petitioner's allegations of prosecutorial misconduct can be grouped into five categories. Petitioner contends that the prosecutor (1) improperly "death-qualified" the jury during voir dire; (2) improperly injected victim impact evidence and argument into the trial; (3) improperly commented on Petitioner's failure to testify; (4) made various improper and inflammatory arguments during closing arguments; and (5) improperly appealed to the jury's sense of societal duty to impose the death penalty. We will address each of these in turn.

### A. "Death-Qualification" of Jury

Petitioner argues that the prosecutor improperly secured a commitment from each juror that the juror could impose the death penalty in Petitioner's case. In *Lockhart v. McCree*, 476 U.S. 162, 173 (1986), the Supreme Court held that "the Constitution does not prohibit the States from 'death qualifying' juries in capital cases." The State is allowed to remove, for cause, "prospective jurors whose opposition to the death penalty is so strong that it would prevent or substantially impair the performance of their duties as jurors." *Id.* at 165; *accord Morgan v. Illinois*, 504 U.S. 719, 733 (1992); *Buchanan v. Kentucky*, 483 U.S. 402, 414 (1987). The Court has held that a juror may not be excluded merely "because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968). However, instead of prohibiting inquiry into whether a prospective juror could impose the death penalty if the case so merited, these principles "demand inquiry into whether the views of prospective jurors on the death penalty would disqualify them from sitting." *Morgan*, 504 U.S. at 731.

A review of the record in this case indicates that the prosecutor was well within the scope of these governing principles in his questioning of prospective jurors. The prosecutor merely asked the jurors whether they could impose the death penalty if they believed that Petitioner was guilty of aggravated murder beyond a reasonable doubt and that the

After considering the post-conviction petition, the affidavits Petitioner submitted in support of the petition, and the entirety of the record, the common pleas court made specific findings of fact and conclusions of law, denied an evidentiary hearing, and dismissed the petition. The Hamilton County Court of Appeals reviewed these findings and conclusions, and affirmed the trial court in all respects. The appellate court's opinion included specific factual findings and concluded that an evidentiary hearing was not required, because Petitioner had failed to present evidence that he had a substantive ground for relief. *See State v. Byrd*, No. C-910340, at 5 (Ohio Ct. App. 1 Dist., Feb. 26, 1992).

On habeas review, the district court concluded that the factual findings of the state courts were entitled to the presumption of correctness, because Petitioner had failed to establish any of the eight exceptions contained in 28 U.S.C. § 2254(d). The essence of Petitioner's claim on appeal is that the record in the state court proceedings, and therefore in the district court, was inadequately developed and that he is entitled to discovery and an evidentiary hearing in federal court in order to provide substance to the claims raised in his habeas petition. However, the conclusion is inescapable that, if the state court record was inadequately developed, it was so because Petitioner failed to pursue the avenues that were available to him to develop it.

If a habeas petitioner has failed to develop the factual basis of a claim in the state trial court, petitioner must show cause and prejudice or a fundamental miscarriage of justice before relitigating the facts. *See Keeney v. Tamaro-Reyes,* 504 U.S. 1, 11-12 (1992); *Mitchell v. Rees*, 114 F.3d 571, 579 (6th Cir. 1997), *cert. denied*, 522 U.S. 1120 (1998).[30] We find no

---

[30] We note that, in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, Congress added an evidentiary hearing provision to the habeas corpus statute. Section 2254(e)(2), as amended by the AEDPA, now provides as follows:

(2) If the applicant has failed to develop the factual basis of a

indication that Petitioner attributes this failure to anything other than Ohio's statutory and procedural requirements and the state courts' interpretation and utilization of them. However, as we have exhaustively recounted, Petitioner has failed to show that Ohio's post-conviction relief system caused his failure to conduct adequate discovery. Perhaps Petitioner's post-conviction counsel negligently failed to pursue potential avenues of discovery adequately. Even so, this is clearly not a sufficient ground for relief, as the Supreme Court has held that ineffective assistance of post-conviction counsel cannot constitute "cause." *See Coleman v. Thompson*, 501 U.S. 722, 755-57 (1991). The Court also has noted that "[i]t is hardly a good use of scarce judicial resources to duplicate factfinding in a federal court merely because a petitioner has negligently failed to take advantage of opportunities in state-court proceedings." *Keeney*, 504

---

claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that—

(A) the claim relies on—
(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

§ 104, 110 Stat. at 1219. Where the omission of material facts from the state court record is attributable to the habeas petitioner, the new legislation both codifies and narrows the standard set forth in *Keeney*. *See Weeks v. Bowersox*, 119 F.3d 1342, 1354 n.12 (8th Cir. 1997), *cert. denied*, 522 U.S. 1093 (1998). Of course, the provisions of the AEDPA are not applicable to Petitioner's case. *See Lindh v. Murphy*, 521 U.S. 320 (1997).

602 F.2d 117, 119 (6th Cir. 1979)); *see Darden*, 477 U.S. at 181; *Serra*, 4 F.3d at 1355; *Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982) (en banc). Indeed, our case law demonstrates the "extreme nature of prosecutorial misconduct required for a federal court to issue the writ." *Angel*, 682 F.2d at 609 (quoting *Cook*, 602 F.2d at 102).

The factors to consider in determining whether this stringent standard has been met in a habeas case have been articulated consistently by this circuit as follows:[37]

[W]e consider the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury, and the strength of the competent proof to establish the guilt of the accused.

*Pritchett*, 117 F. 3d at 964 (quotations and citations omitted). Important to our analysis as well is the principle that relief will not be granted unless "the prosecutor's statement likely had a bearing on the outcome of the trial in light of the strength of the competent proof of guilt." *Id.* (citing *Angel*, 682 F.2d at 608). Finally, "each case turns on its own unique facts and . . . only a full review will reveal whether a constitutional violation took place." *Cook*, 602 F.2d at 120. To constitute a denial of due process, the misconduct must be "so pronounced and persistent that it permeates the entire atmosphere of the trial." *Pritchett*, 117 F.3d at 964 (internal quotations omitted). For the reasons set forth below, we must conclude that Petitioner's claims do not meet this demanding standard.

---

[37]We note that other tests have been used in the context of a direct appeal of a federal criminal conviction. *See United States v. Carroll*, 26 F.3d 1380 (6th Cir. 1994). These tests, however, are not applicable to the present case, because, as noted above, we lack supervisory powers over state court proceedings. Our standard of review on habeas review is limited to whether there has been a denial of due process. In this respect, this Court has been consistent in its application of the standards and factors on which we rely to resolve Petitioner's claims.

Having rejected each of the claims of ineffective assistance of appellate counsel presented above, we now consider in Part VII Petitioner's claims of prosecutorial misconduct during his trial.

## VII. Prosecutorial Misconduct Claims

Petitioner contends that his appellate counsel were ineffective for failing to raise certain claims of prosecutorial misconduct. Petitioner alleges that various instances of unconstitutional prosecutorial misconduct occurred during the course of his trial and that they warrant a reversal of his longstanding conviction and death sentence. Petitioner's burden on habeas review is quite a substantial one. For relief to be granted, the misconduct must have "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). We do not possess supervisory powers over state court trials. *Cook v. Bordenkircher*, 602 F.2d 117, 119 n.5 (6th Cir. 1979) ("it is the responsibility of the [state courts] to police their prosecutors; we have no such authority."). Therefore, on habeas review, our standard of review is limited to "'the narrow one of due process.'" *Darden*, 477 U.S. at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. at 642).

In making this determination, we must bear in mind that "'the touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor.'" *Serra v. Michigan Dep't of Corrections*, 4 F.3d 1348, 1355 (6th Cir. 1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)); *see Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir.) (quoting *Serra*, 4 F.3d at 1355), *cert. denied,* 118 S.Ct. 572 (1997). Therefore, even if the prosecutor's conduct was "undesirable or even universally condemned," *Darden*, 477 U.S. at 181 (quotation marks and citation omitted), it does not constitute a due process violation unless "the conduct was 'so egregious so as to render the entire trial fundamentally unfair.'" *Pritchett*, 117 F.3d at 964 (quoting *Cook v. Bordenkircher*,

U.S. at 9. To hold otherwise in Petitioner's case would not only be contrary to well-settled law, but also would establish a blueprint for delay by other capital defendants. This we are unwilling to do. As the Supreme Court stated in *Keeney*: "The state court is the most appropriate forum for resolution of factual issues in the first instance, and creating incentives for the deferral of factfinding to later federal-court proceedings can only degrade the accuracy and efficiency of judicial proceedings." *Id.* Similarly, in *Eaton v. Angelone*, 139 F.3d 990, 995 (4th Cir.), *cert. denied*, 524 U.S. 934 (1998), the Fourth Circuit explained:

> More fundamentally, we refuse to transform a federal habeas proceeding into a second trial. In this case an evidentiary hearing would be precisely that. The Supreme Court has charged us to preserve "the state trial on the merits [as] the 'main event,' so to speak, rather than a 'tryout on the road' for what will later be the determinative federal habeas hearing." *Wainwright v. Sykes*, 433 U.S. 72, 90, 97 S.Ct. 2497, 2508, 53 L.Ed.2d 594 (1977). We would be unfaithful to this charge if we acted to supplant the state factfinding process with repetitive federal proceedings.

We share these same sentiments here.

Although the procedural history of this case in the state courts is labyrinthine, one thing is clear: Petitioner is not entitled to discovery and an evidentiary hearing. Because Petitioner failed to rebut the statutory presumption of correctness that the federal habeas court must award to the factual findings of the state courts, the district court properly concluded that it was required to defer to those factual findings. Furthermore, given this conclusion, we would be hard-pressed to say that the district court abused its discretion in denying further discovery on these issues. *See Rules Governing Section 2254 Cases in the United States District Courts*, Rule 6(a) ("A party shall be entitled to invoke the processes of discovery . . . if, and to the extent that, the

judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise.'").

## IV.  Analysis of Petitioner's *Brady* Claims

In *Kyles v. Whitley*, 514 U.S. 419 (1995), the Supreme Court recently summarized the relevant law on *Brady* violations. The Court reaffirmed the rule that "'a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.* at 433 n.7 (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)). It is settled that there exists no difference between exculpatory and impeachment evidence for *Brady* purposes. *Id.* at 433. Of course, our conclusion that we must defer to the factual findings of the state courts necessarily requires that we deny Petitioner relief on the basis of his *Brady* claims. These factual findings establish, among other things, that Armstead "received no bargain or deal from the State in return for his testimony," that "Petitioner has submitted no credible evidence suggesting that Ronald Armstead lied, or that would result in the probability of a different outcome at a second trial," and that "[n]o evidence favorable to the defendant [i.e. Petitioner] was suppressed by the State." JA at 1874, 1878.

We also reject Petitioner's argument that Armstead's testimony that he had no charges pending at the time of Petitioner's trial violated *Brady*. The record indicates that the prosecution provided defense counsel with a copy of Armstead's record. The record which Petitioner attached to his "Petition to Vacate or Set Aside Sentence: R.C. Section 2953.21" indicates "015Y" (fifteen years) across from the date of disposition of Armstead's felonious assault conviction and "005Y" (five years) across from the date of disposition of his drug trafficking conviction. The record states the date that the fifteen and five years were imposed as "Date Disp. 11/25/80." Armstead's record also noted, among other things, prior convictions for assault with intent to rape, sodomy, and assault and battery. Although it should have been obvious

under the Confrontation Clause were violated by the introduction of hearsay evidence of Monte Tewksbury's statements immediately before his death. The admission of hearsay evidence does not violate the Confrontation Clause where the witness is unavailable and the statement bears adequate indicia of reliability. *Idaho v. Wright*, 497 U.S. 805, 814 (1990). "Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception." *Id.* at 815. The hearsay exception for dying declarations has been recognized by the Supreme Court since at least 1892. *See Mattox v. United States*, 146 U.S. 140, 151 (1892); *Pointer v. Texas*, 380 U.S. 400, 407 (1965). The dying declarations exception is firmly rooted, and the admission of Monte's dying declarations did not violate Petitioner's rights under the Confrontation Clause.

Petitioner next contends that the trial court acted improperly in allowing the jury to be "death-qualified," and in admitting improper evidence and allowing improper arguments by the prosecutor. We reject Petitioner's claims. First, it is not improper for jurors to be death-qualified, i.e., to be asked whether they could impose capital punishment, if warranted, regardless of any personal opposition that they might have. *Lockhart v. McCree*, 476 U.S. 162, 173 (1986). Second, we find that the evidence and arguments complained of were not improper, and, therefore, it was not error for the judge to allow them at trial. In any event, it is surely not our role on habeas review to decide whether a state trial judge's decision whether to admit evidence pursuant to state evidentiary rules was a proper one. Our sole task is to decide whether federal constitutional violations have occurred. *See Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983) ("[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules."). Petitioner's final claim is that his appellate counsel were constitutionally ineffective for failing to argue on direct appeal that Petitioner was denied a fair trial because the prosecution presented testimony of a "jailhouse informant." This claim has no merit.

give under Ohio law. *See* Ohio Rev. Code Ann. § 2901.05(B) & (D) (Anderson 1996). This Circuit has previously upheld the constitutionality of this instruction. *See Thomas v. Arn*, 704 F.2d 865, 869 (6th Cir. 1983). Similarly, Petitioner challenges instructions which stated that the jury's verdict was only a recommendation, that the jury was to consider all statutory mitigating factors, and that if the aggravating circumstances outweighed the mitigating factors then a recommendation of death was mandatory. These challenges are without merit as well. These instructions reflect Ohio statutory law, *see* Ohio Rev. Code Ann. §§ 2929.03(D)(2) & 2929.04(B) (Anderson 1996), and raise no constitutional concerns.

Nor do we find any problems with the remaining instructions Petitioner contests. The trial judge's instruction that the jury could consider the arguments of counsel in weighing the aggravating circumstances against the mitigating factors was proper, especially since the judge distinguished between evidence and arguments of counsel and previously had provided an instruction that the arguments of counsel were not evidence. The instruction that a jury verdict recommending a life sentence must be unanimous was a proper statement of Ohio law, *see State v. Brooks*, 661 N.E.2d 1030, 1042 (Ohio 1996), and was constitutionally permissible. Finally, Petitioner contends that the judge's instruction that the jury must not be motivated by feelings of sympathy but must render a fair and impartial verdict was improper. This argument is utterly without merit, as such an instruction is a perfectly appropriate and indeed wise one. In sum, none of the judge's instructions to the jury was unconstitutional, and Petitioner's claim that his appellate counsel was constitutionally ineffective for failing to raise them must necessarily fail.

### D. Miscellaneous Claims

The remaining claims that Petitioner asserts as a basis for his ineffective assistance of appellate counsel argument also lack any hint of merit. First, Petitioner argues that his rights

from his record that Armstead was on some form of parole when he was arrested in December 1982, defense counsel never questioned Armstead regarding whether his parole status would be adversely affected by the six-month sentence he received in March 1983 following his plea of guilty to assault and attempted petty theft. This Circuit has held that "[n]o *Brady* violation occurs 'where a defendant knew or should have known the essential facts permitting him to take advantage of any exculpatory information, or where the evidence is available from another source.'" *See Workman v. Bell*, 178 F.3d 759, 767 (6th Cir. 1998) (quoting *United States v. Clark,* 928 F.2d 733, 738 (6th Cir. 1991)), *cert. denied*, 120 S.Ct. 264 (1999). This principle applies in the impeachment context as well, as there exists no difference for *Brady* purposes between exculpatory and impeachment evidence. *See Kyles*, 514 U.S. at 433. Under these circumstances, it is difficult to conclude that Armstead's testimony violated *Brady*. The prosecution provided Petitioner's defense counsel with sufficient information to enable counsel to question Armstead regarding his status at the conclusion of his six-month sentence in the Cincinnati Workhouse. The fact that defense counsel failed to do so was no fault of the State.

In any event, in order to establish a claim of prosecutorial misconduct or denial of due process, the defendant must show that the statement in question was false, that the prosecution knew it was false, and that it was material. *See United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir. 1989); *United States v. O'Dell*, 805 F.2d 637, 641 (6th Cir. 1986). Moreover, the defendant must show that the statement in question was "indisputably false," rather than merely misleading. *Lochmondy*, 890 F.2d at 823. Here, we simply cannot say that Armstead's statement that he did not have any charges pending at the time of Petitioner's trial was "indisputably false." Armstead certainly was not facing any *criminal* charges when he testified in Petitioner's case. At the time of trial in August 1983, Armstead was nearing completion of his six-month sentence at the Cincinnati Workhouse that he had received in March 1983. In our view, Armstead's answer indicates that he interpreted defense

counsel's question as referring specifically to *criminal* charges and not as encompassing the parole revocation hearings he would face at the end of his six-month sentence at the Cincinnati Workhouse.[31]   Tr. at 1569 ("I got my time in March the 15th and I don't have no time pending or nothing else pending.").[32]   Moreover, the prosecutor himself appears to have interpreted defense counsel's question to refer to *criminal* charges.   Tellingly, when defense counsel asked Armstead about any pending charges, the prosecutor objected, stating "[w]e have been over that." Tr. at 1569.   In lodging his objection, the prosecutor obviously was referring to defense counsel's previous cross-examination of Armstead regarding his criminal history.   This indicates that the prosecutor did not know that Armstead's testimony was "false," another requirement for a *Brady* violation.

Nor are we inclined to find that the statement was material. In *United States v. Avellino*, 136 F.3d 249, 257 (2nd Cir. 1998), the Second Circuit remarked: "where the undisclosed

---

[31]We note that the Hamilton County Court of Common Pleas similarly interpreted Armstead's testimony in denying Petitioner's post-conviction petition. *See supra* at p. 30 & n.19.

[32]Petitioner included in his brief the following excerpt from Armstead's testimony at the trial of William Woodall.   The following colloquy occurred during defense counsel's cross-examination of Armstead regarding Armstead's motivation for testifying against Woodall:

Q [by defense counsel]:   And you didn't expect to receive anything in exchange for doing your good civic duty as a citizen?

A [by Armstead]:   My time is up, I got three more weeks—about two or three more weeks and my *six months* will be up.

Petitioner's Br. at  67 n.28 (emphasis added).   We note that Armstead stated that his "six months" would be completed in two or three weeks. Similarly, in Petitioner's case, Armstead remarked that "I got my time in March the 15." Tr. at 1569.   These statements clearly refer to the sentence Armstead received on March 15, 1983, following his guilty plea.

---

the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *Id.* at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). Moreover, the Supreme Court has cautioned that it has "defined the category of infractions that violate 'fundamental fairness' very narrowly." *Dowling v. United States*, 493 U.S. 342, 352 (1990).   Petitioner has not come close to meeting this standard here.

First, Petitioner argues that the trial judge improperly instructed the jury on causation and undermined the specific intent to kill requirement that is necessary for a finding of aggravated murder in Ohio. The trial judge instructed the jury that the causation requirement is met when death is the natural and foreseeable result of the defendant's actions. The trial judge continued:

The test for foreseeability is not whether the defendant should have foreseen the death in its precise form.   The test is whether in light of all the circumstances, a reasonably prudent person would have anticipated that death was likely to result to anyone from the performance of the act or acts.

Tr. at 1697.   In his habeas petition, Petitioner argues that this instruction was "completely incompatible with the requirement that the defendant must have a specific intent to cause a certain result — the death of another person." JA at 247.   We are unpersuaded.   In his immediately preceding instruction, the trial court informed the jury that "[n]o person may be convicted of aggravated murder unless he is specifically found to have intended to cause the death of another." Tr. at 1697.   In our view, the causation instruction did not undermine the requirement of specific intent. In short, it was not even an erroneous instruction, much less an unconstitutional one.

Petitioner's challenge to the judge's instruction defining reasonable doubt must also fail. The trial judge's instruction was taken virtually verbatim from the statutorily required definition of reasonable doubt that the judge was required to

mitigation material with Petitioner, as well as his mother, sister, grandmother, and stepfather. Counsel made a determination that this material would be presented most credibly by Petitioner's mother. In affirming the common pleas court, the Hamilton County Court of Appeals noted:

> The remaining affidavits [from Petitioner's family members, former girlfriend, and parole officer] share a common theme, *i.e.*, that Byrd's life was fraught with abuse, rejection, disappointment and violence. At the mitigation hearing, Byrd's mother recounted numerous negative episodes of Byrd's life. The trial court, in its opinion, recognized that Byrd had been subjected to abuse and that he had endured various difficulties in his life. Thus, the evidence of Byrd's chaotic life, as set forth in the supporting affidavits, is merely cumulative to that presented at trial by Byrd's mother.

*State v. Byrd*, No. C-910340, 1992 WL 37761, at *6 (Ohio Ct. App. 1 Dist., Feb. 26, 1992). The common pleas court also determined that counsel made a tactical decision not to introduce records regarding Petitioner's juvenile, medical, and school records so as to avoid revealing Petitioner's prior behavior patterns to the jury. Finally, the common pleas court found that the trial court had authorized Petitioner to employ a psychologist or a psychiatrist; however, Petitioner refused to be interviewed by either. Given these factual findings, we conclude that Petitioner has not shown that defense counsel's performance at the mitigation phase was constitutionally ineffective.

## C. Jury Instructions

Petitioner next claims that his appellate counsel were constitutionally ineffective for failing to challenge several of the trial judge's instructions to the jury at both the guilt and penalty phases of Petitioner's trial. The standard we apply on habeas review is highly demanding. Indeed, "the fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief." *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991). Rather, the sole question on habeas is "'whether

evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material." We already have noted the extensive amount of impeachment information that Petitioner's counsel elicited during his cross-examination of Armstead. This information included, among other things, Armstead's then-current incarceration in the maximum security area of the Cincinnati Workhouse, as well as his conviction within the preceding ten years of an offense carrying a sentence of more than one year in prison. Hence, Armstead's credibility had been seriously questioned. To be sure, defense counsel certainly could have asked Armstead whether he was facing a parole revocation hearing after the completion of his sentence in the Workhouse. However, if defense counsel had asked such a question, the prosecution presumably would have responded on re-direct examination by asking Armstead whether he had entered into any type of agreement with the prosecution concerning its assistance at his upcoming hearing. There would not have been anything further to explore; as the state courts found, there was no evidence that Armstead had struck any sort of a deal with the prosecution prior to his testimony at Petitioner's trial.

In our view, Armstead had been subjected to extensive impeachment by defense counsel, and it is difficult to conclude that there exists a reasonable probability that, had the issue of Armstead's upcoming parole hearing been disclosed, the outcome in Petitioner's trial would have been different. *See Kyles*, 514 U.S. at 433-34; *United States v. Bagley*, 473 U.S. 667, 678 (1985); *cf. Agurs*, 427 U.S. at 109 ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense."). In short, we simply cannot say that this evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

For the foregoing reasons, we reject Petitioner's claims of *Brady* violations in this case.

## V. Procedural Issues Related to the Ineffective Assistance of Counsel Claims

Petitioner further alleges that his trial counsel were ineffective in violation of his Sixth Amendment right to counsel. To prevail, Petitioner must show not only that performance of counsel was deficient but also that this deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

### A. Ineffective Assistance of Trial Counsel Claims

On appeal, Petitioner raises ineffective assistance of trial counsel challenges to the representation provided by his defense counsel at the guilt and penalty phases.[33] Petitioner contends that defense counsel were ineffective at the guilt stage as a result of (1) their failure to present an opening statement; (2) the fact that one of the two defense counsel refused to participate in the preparation of Armstead's cross-examination, because that counsel previously had represented Armstead in a criminal matter; and (3) the failure of defense counsel to object to alleged prosecutorial misconduct.

Petitioner posits several arguments with respect to counsel's performance at the penalty phase of his trial. At the outset, Petitioner contends that defense counsel were ineffective due to their failure to investigate possible mitigating factors. Petitioner asserts that counsel failed to obtain an independent mental health expert after the trial court authorized counsel to do so, and failed to request the

---

[33] In the district court, Petitioner alleged that defense counsel were ineffective at the pre-trial and voir dire stages as well. However, Petitioner does not assert these particular ineffectiveness arguments on appeal. Curiously, Petitioner nonetheless contends that his counsel on *direct appeal* were ineffective for failing to raise the claim of misconduct by the State's attorneys during voir dire.

not shown that this decision was anything other than a legitimate tactical decision, *see Nguyen v. Reynolds*, 131 F.3d 1340, 1350 (10th Cir. 1997), *cert. denied*, 119 S. Ct. 128 (1998), nor has he shown a reasonable probability of a different outcome had defense counsel, in fact, made an opening statement. None of the alleged instances of ineffective trial counsel has merit. Moreover, we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland v. Washington,* 466 U.S. 668, 689 (1984). Therefore, Petitioner's appellate counsel were not constitutionally ineffective for failing to raise these issues on direct appeal.

### B. Ineffective Assistance of Trial Counsel (Penalty Phase)

Petitioner contends that he received constitutionally ineffective assistance of counsel at the penalty phase of his trial. The Eighth Amendment requires a jury to consider the circumstances of the crime and the defendant's character and background during the sentencing phase of a capital trial. *Boyde v. California*, 494 U.S. 370, 377-78 (1990); *Austin v. Bell*, 126 F.3d 843, 848 (6th Cir. 1997), *cert. denied*, 523 U.S. 1079 (1998). Moreover, the Constitution requires defense counsel to conduct a reasonable investigation into the defendant's background and present it to the jury. *Austin*, 126 F.3d at 848. Failure to do either may constitute ineffective assistance of counsel. *Id.*; *Glenn v. Tate*, 71 F.3d 1204, 1206-08 (6th Cir. 1995). Petitioner argues that counsel was ineffective for failing to present sufficient mitigation evidence and obtain the assistance of an independent psychologist. Petitioner's defense in mitigation consisted of nine pages of testimony from his mother, Mary Ray, as well as an unsworn statement from Petitioner expressing "regret" over the incident.

We are unpersuaded that counsel's performance was constitutionally ineffective. The factual findings of the common pleas court establish that defense counsel discussed

to at trial was not crucial to proof of defendant's guilt." The court declined to place any weight on the affidavits submitted by Petitioner's purported experts, finding that one of the purported experts "was not qualified to give an expert opinion on matters of forensic pathology," and that the conclusions of another were "without any basis in fact." JA at 1888, 1890. The court stated: "Petitioner does not allege that he possesses any new evidence or could obtain any such evidence, which would aid his client." JA at 1890. We agree with this analysis.

Petitioner cites his trial counsel's decision not to present a defense of intoxication as another instance of alleged ineffectiveness. We disagree. There is no evidence of intoxication in this case aside from Petitioner's self-serving statements. Moreover, an intoxication defense presumably would have required Petitioner to admit to the act of stabbing and killing Monte Tewksbury, an admission that likely would have been detrimental to his defense. *See State v. Poole*, 294 N.E.2d 888, 889 (Ohio 1973) (listing intoxication as one of several affirmative defenses consistently recognized in Ohio). Petitioner has shown nothing to undermine the common pleas court's finding that counsel made a legitimate tactical decision not to raise intoxication as a defense. Thus, we reject his argument.

Petitioner further contends that his trial counsel were ineffective for failing to voir dire potential jurors adequately, to make an opening statement, and to object to prosecutorial misconduct. The common pleas court found that defense counsel had adequate information at voir dire regarding potential jurors and had a particular type of juror in mind. The court concluded that counsel's performance at voir dire was not ineffective. Petitioner has not convinced us otherwise. Petitioner's other claims of ineffective assistance of counsel are similarly unpersuasive. The failure to object to alleged prosecutorial misconduct did not rise to the level of constitutional infirmity. *See infra* Part VII. Nor did defense counsel's decision not to make an opening statement render their performance constitutionally ineffective. Petitioner has

appointment of an independent mitigation specialist. Petitioner maintains that the alleged failure of defense counsel to obtain a psychological expert prevented Petitioner from presenting mitigation evidence about his background and how factors from his background affected his behavior. In addition, Petitioner argues that a mitigation specialist would have helped counsel investigate, prepare, and present information regarding Petitioner's history, family background, and formative environment. Petitioner presents several additional arguments as well. He contends that defense counsel's opening statement at the penalty phase was deficient and revealed a lack of "thorough familiarity" with the law and the evidence presented. Petitioner also challenges the extent of the defense's mitigation case, which consisted of testimony from Petitioner's mother and an unsworn statement from Petitioner. Petitioner argues that "[t]he brevity and sparseness of the defense case provided Petitioner's jurors with no real understanding of how or why the Petitioner wound up on the wrong end of a capital indictment." JA at 237. Finally, Petitioner contends that defense counsel were ineffective in the penalty phase for failing to object to numerous instances of alleged prosecutorial misconduct at closing argument, as well as certain allegedly improper instructions from the trial court.

The district court found that the great bulk of Petitioner's ineffective assistance of trial counsel claims were procedurally defaulted, because they had not been raised properly in the Ohio state courts. The district court found that only the following issues were properly preserved: (1) That counsel was ineffective for breaching their pre-trial duty to investigate and thus failing to determine that Armstead's testimony was false and that Armstead had reached a deal with the prosecutors in exchange for his testimony; (2) that counsel was ineffective for failing to object to the trial court's instruction to the jury at the penalty phase that it could not be governed by considerations of sympathy; and (3) that counsel was ineffective for failing to object when the trial court permitted the prosecutor to argue that the jury should sentence Petitioner to death as a duty to satisfy society's moral outrage.

In our view, it also appears that the Hamilton County Court of Appeals did not apply a procedural bar and decided on the merits Petitioner's claim that defense counsel were ineffective at the penalty phase due to their failure to present additional mitigation evidence. Petitioner does not argue that the remaining ineffective assistance claims were considered by the state courts on their merits. Indeed, Petitioner acknowledges that he raised his ineffective assistance of trial counsel claims in his post-conviction petition to vacate sentence pursuant to Ohio Rev. Code § 2953.21, and both the common pleas court and the Hamilton County Court of Appeals declined to reach the merits, finding that the claims were barred by the doctrine of res judicata. Thus, as to these defaulted claims, we must consider whether the applicable Ohio procedural rule constitutes an adequate and independent state ground. We hold that it clearly does.

### B. Procedural Default of Trial Counsel Claims

Federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991). In 1967, the Ohio Supreme Court held that "[c]onstitutional issues cannot be considered in post-conviction proceedings under Section 2953.21 *et seq.*, Revised Code, where they have already been or could have been fully litigated by the prisoner while represented by counsel, either before his judgment of conviction or on direct appeal from that judgment, and thus have been adjudicated against him." *State v. Perry*, 226 N.E.2d 104, 105-06 (Ohio 1967) (syllabus para. 7). In *State v. Cole*, 443 N.E.2d 169 (Ohio 1982), the state supreme court articulated how this procedural rule would apply with respect to ineffective assistance of trial counsel claims. The court explained: "Where defendant, represented by new counsel upon direct appeal, fails to raise therein the issue of competent trial counsel and said issue could fairly have been determined without resort to evidence *dehors* [i.e., outside] the record, *res judicata* is a proper basis for dismissing

## VI. Analysis of the Merits of Petitioner's Ineffective Assistance of Appellate Counsel Claims

Each of Petitioner's ineffective assistance of appellate counsel claims alleges a failure on the part of counsel to raise a certain issue on direct appeal. For convenience, we group these claims into the following five categories: (1) Ineffective assistance of trial counsel (guilt phase); (2) ineffective assistance of trial counsel (penalty phase); (3) prosecutorial misconduct; (4) jury instructions; and (5) miscellaneous. We will now review the merits of these claims with the exception of the prosecutorial misconduct arguments, which we will address separately in Part VII.

### A. Ineffective Assistance of Trial Counsel (Guilt Phase)

Petitioner argues that his appellate counsel were constitutionally ineffective for failing to raise certain claims of alleged ineffective assistance of trial counsel at the guilt phase of his trial. These claims are completely without merit. First, petitioner alleges that his trial counsel were constitutionally ineffective for failing to file a motion for discovery as to the existence of any deals between the prosecution and any of its witnesses. There is no evidence whatsoever that any such deals existed, and the common pleas court made specific findings to this effect in denying Petitioner's post-conviction petition.

Petitioner also contends that trial counsel were ineffective for failing to retain experts to test the State's physical evidence. Petitioner maintains that counsel should have obtained a criminologist to analyze evidence regarding blood stains that were found on Petitioner's clothing and on a knife found in the van, and shoe prints that were taken from the crime scene. However, the common pleas court found that "[t]he jury was aware that exhibit 7, the knife, could not be shown to be the murder weapon, that the blood stains could not be shown to be the victim's and that the shoe prints were *not* those of defendant Byrd." *State v. Byrd*, No. B-831662 (Hamilton County C.P. Oct. 2, 1989). The court further found that "[t]he source of the blood which was tested and testified

that an ineffective assistance of appellate counsel claim can establish cause for a procedural default of an independent claim and need not itself be subjected to a procedural default analysis as long as the ineffective assistance of appellate counsel claim has been presented to the state courts and exhausted. *See id.* at 945. The panel stated that "[t]he Supreme Court . . . [has] not implement[ed] a procedural default requirement for claims asserted as cause, and until it does, we see no reason to engraft such a requirement on our own." *Id.*

We recognize that the Supreme Court has granted certiorari to review this aspect of *Carpenter*. *See also Stewart v. LaGrand*, 526 U.S. 115, 120 (1999) (per curiam) (finding that an ineffective assistance of counsel claim could not be considered as cause to excuse a procedurally defaulted claim because, among other things, the claim asserted as cause had itself been defaulted, and the petitioner had failed to demonstrate cause and prejudice for this default). However, regardless of *Carpenter*, our review of the underlying merits of Petitioner's ineffective assistance of appellate counsel claims in Parts VI and VII, *infra,* convinces us that these claims do not warrant relief on habeas. As a result, Petitioner's ineffective assistance of appellate counsel claims cannot constitute cause to excuse the procedural default of his ineffective assistance of trial counsel claims.

---

R. 26 and 14(B).").

To be sure, the decision in *Rone* was relevant to the court of appeals's determination to deny the motion for reconsideration. However, *Rone* was not the procedural rule upon which the Hamilton County Court of Appeals relied in denying the motion for reconsideration. The court of appeals simply held that, as a matter of state law, *Rone* and several other decisions of the Hamilton County Court of Appeals precluded a finding of "good cause" in Petitioner's case. The Hamilton County Court of Appeals had affirmed Petitioner's conviction and sentence in 1986, yet Petitioner did not file his motion for reconsideration until 1992. In light of its previous decisions, the court of appeals held that, as a matter of state law, no "good cause" had been shown.

---

defendant's petition for post-conviction relief." *Id.* at 170 (syllabus).

Before applying a state procedural bar, the federal court must determine whether (1) the state courts actually enforced their state's procedural rule, *see Reynolds v. Berry*, 146 F.3d 345, 347 (6th Cir. 1998); *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); and (2) the rule in question is "firmly established and regularly followed," *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991); *James v. Kentucky*, 466 U.S. 341, 348-51 (1984). An adequate and independent procedural default rule bars habeas review of a petitioner's federal claim unless the petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that a failure to consider the federal claim will result in a fundamental miscarriage of justice. *Coleman,* 501 U.S. at 749-50; *Harris v. Reed*, 489 U.S. 255, 262 (1989).[34] On appeal, Petitioner raises two principal arguments: (1) That the Ohio rule relied on in this case to bar federal review of Petitioner's ineffective assistance of trial counsel claims does not constitute an "adequate and independent" state ground; and (2) in any event, Petitioner can show cause, i.e., the ineffective assistance of his appellate counsel to raise the claims, and prejudice resulting therefrom.

Petitioner cites a total of four cases from the Ohio Supreme Court, which he contends show that neither *Perry*'s res judicata rule in general nor its application in *Cole*-type situations in particular is regularly followed, and hence the State's res judicata rule is insufficient for purposes of applying procedural default. We do not agree. First, we note that this circuit has applied *Cole* in holding that an ineffective assistance of trial counsel claim had been procedurally defaulted. *See Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998). Second, we note in any event that the Supreme Court

---

[34]"The miscarriage of justice exception is concerned with actual as compared to legal innocence." *Calderon v. Thompson*, 523 U.S. 538 (1998) (quoting *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)). Petitioner does not argue that this exception applies to his case.

has indicated that a procedural rule need not be applied in *every* applicable case. *Dugger v. Adams*, 489 U.S. 401, 410 n.6 (1989). Rather, the Court in *Dugger* found a procedural rule to be sufficient where it was applied "[i]n the vast majority of cases." *Id.* Moreover, the case law Petitioner cites is unpersuasive. In *State v. Howard*, 537 N.E.2d 188 (Ohio 1989), as Justice Resnick noted in her dissenting opinion, the same attorney represented the defendant at trial and on direct appeal. *Id.* at 196 (dissenting opinion). Hence, *Cole* was inapplicable. In *State v. Decker*, 502 N.E.2d 647, 649 n.3 (Ohio 1986), the Ohio Supreme Court pointed out in its opinion that the defendant had not raised his ineffective assistance of trial counsel claim on direct appeal. The State presumably failed to raise res judicata as a defense. Moreover, in *State v. Nichols*, 463 N.E.2d 375, 376-77 (Ohio 1984), the state supreme court expressly noted the limited issue before it: "Nichols' latest constitutional claims . . . were not presented to either the trial court or the court of appeals. Accordingly we will confine ourselves to the procedural question presented and make no attempt . . . to review the . . . constitutional claims." Finally, *State v. Cooperrider*, 448 N.E.2d 452 (Ohio 1983), upon which Petitioner relies heavily, is entirely consistent with *Cole*. *Cooperrider* has been consistently interpreted to stand for the proposition that a claim of ineffective assistance of trial counsel, which is dependent upon evidence *outside* the record, is to be raised in a post-conviction proceeding rather than on direct appeal. *See, e.g., State v. Kent*, No. 96CA794, 1998 WL 106158, at *4 (Ohio Ct. App. 4 Dist., Mar. 4, 1998); *State v. Hull*, No. 58024, 1990 WL 14156, at *1 (Ohio Ct. App. 8 Dist., Feb. 15, 1990).

In sum, Petitioner's argument that the *Cole* rule is not regularly applied in Ohio and thus does not constitute an adequate and independent state law ground for purposes of invoking a procedural bar to Petitioner's ineffective assistance of trial counsel claims is rejected. As the district court correctly found, Ohio state courts consistently invoke *Cole* and apply res judicata when a defendant, who is represented by new counsel on direct appeal, fails to raise at that stage of

Court repeatedly since 1983." *State v. Byrd*, No. C- 830676, at 1 (Ohio Ct. App. 1 Dist, Oct. 1, 1992). The Ohio Supreme Court rejected two subsequent appeals in separate orders. *See State v. Byrd*, No. 92-2222, at 1 (Ohio Oct. 27, 1993); *State v. Byrd*, No. 86-512, at 1 (Ohio Oct. 27, 1993).

### E.  *Carpenter v. Mohr*

When Petitioner presented his ineffective assistance of appellate counsel claims on habeas, the district court determined that they had been procedurally defaulted. In the district court's view, the relevant procedural rule was the Hamilton County Court of Appeals's decision in *Rone*. The court concluded that, while no statewide procedure for raising ineffective assistance of appellate counsel claims existed in Ohio until *Murnahan*, the rule in the Hamilton County Court of Appeals had been well established since the decision in *Rone* in August 1983. The court stated: "it was not unreasonable to expect a defendant convicted in Hamilton County to follow the rule established by that County's Court of Appeals." *Byrd v. Collins*, No. C-1-94-167, at 17 (S.D. Ohio Nov. 2, 1995).

On the basis of this Circuit's opinion in *Carpenter v. Mohr*, 163 F.3d 938 (6th Cir. 1998), *cert. granted sub nom, Edwards v. Carpenter*, 120 S.Ct. 444, 68 U.S.L.W. 3008, 68 U.S.L.W. 3305, 68 U.S.L.W. 3310 (U.S. Nov. 8, 1999) (No. 98-2060), the district court's decision to subject Petitioner's ineffective assistance of appellate counsel claims to a procedural default analysis was error.[36]  In *Carpenter*, a panel of this court held

---

[36]In addition, a careful reading of the Hamilton County Court of Appeals's October 1, 1992 "Entry Denying Application for Delayed Reconsideration" indicates that the court did not rely upon *Rone*. Rather, the court relied upon former Ohio Rule of Appellate Procedure 26 — which provided for the reconsideration of an appeals court judgment — and former Rule of Appellate Procedure 14(B) — which required a showing of good cause for the enlargement of time to file an untimely motion. *See State v. Byrd*, No. C-830676, at 1 (Ohio Ct. App. 1 Dist., Oct. 1, 1992) ("The Court . . . finds that said application is not well taken and that the same ought to be and hereby is overruled under App.

Dist., Aug. 31, 1983). The court of appeals stated that, among other alternative remedies, "the appellate court in which counsel has been alleged ineffective could consider the issue upon a motion for reconsideration of its own judgment." *Id.* On the basis of *Rone*, the common pleas court declined to address the merits of Petitioner's claims. On April 1, 1991, in its opinion following a remand from the court of appeals, the common pleas court incorporated its previous conclusion. On February 26, 1992, the Hamilton County Court of Appeals affirmed for the same reasons, and the Ohio Supreme Court subsequently declined to hear Petitioner's appeal of the denial of the post-conviction petition. *State v. Byrd*, 596 N.E.2d 472 (Ohio 1992).

On February 19, 1992, one week before the Hamilton County Court of Appeals's decision in Petitioner's case, the Ohio Supreme Court decided *State v. Murnahan*, 584 N.E.2d 1204 (Ohio 1992). *Murnahan* resolved a split among the state courts of appeals as to the proper procedure for raising claims of ineffective assistance of appellate counsel. *See Manning v. Alexander*, 912 F.2d 878, 881-82 (6th Cir. 1990) (citing cases). The state supreme court determined that claims of ineffective assistance of appellate counsel were not cognizable in post-conviction relief petitions. *Murnahan*, 584 N.E.2d at 1205 (syllabus para. 1). The court explained: "[t]o allow such claims could in effect permit trial courts to second-guess superior appellate courts." *Id.* at 1208. The court concluded that the proper method for raising such claims was a motion for reconsideration in the court of appeals or a direct appeal to the state supreme court. *See id.* at 1208-09.

Approximately four months after the state supreme court's decision, Petitioner finally filed a *Murnahan* petition (i.e., a motion for delayed reconsideration) with the Hamilton County Court of Appeals. The court of appeals refused to consider the petition, finding that there had "been no showing of good cause to justify the delay, considering that the remedy of reconsideration in relation to claims of ineffective assistance of appellate counsel has been discussed by this

the litigation an ineffective assistance of trial counsel claim appearing on the face of the record. *See, e.g., State v. Lentz*, 639 N.E.2d 784, 785 (Ohio 1994) ("This court's decision in *Cole . . .* forms the applicable law in the area [of res judicata]." ); *State v. Caslin*, No. 97APA09-1275, 1998 WL 255559 (Ohio Ct. App. 10 Dist., May 21, 1998) (applying *Cole* to bar a claim of ineffective assistance of counsel); *State v. Combs*, 652 N.E.2d 205 (Ohio Ct. App. 1 Dist. 1994) (same). S*ee also Mapes v. Coyle,*171 F.3d 408, 421 (6th Cir. 1999) (citing *Cole* as the only exception to the res judicata rule set forth in *State v. Perry*).

We have considered Petitioner's remaining arguments challenging the application of *Cole* to this case and find them to be without merit. Suffice it to say, Petitioner was represented by new counsel on direct appeal, and his ineffective assistance of trial counsel claims could have been considered without resort to evidence outside the record. Petitioner failed to raise the great bulk of these claims on direct appeal. We now conclude that Petitioner's ineffective assistance of trial counsel claims—with the exceptions noted above—are procedurally defaulted.[35] Therefore, in order for us to consider them, Petitioner must show cause and prejudice for his failure to raise them in his direct appeal. Petitioner argues that the "cause" behind this failure was the ineffective assistance of his appellate counsel. We turn now to this claim.

### C.  Ineffective Assistance of Appellate Counsel Claims

Petitioner argues that the ineffective assistance of his appellate counsel provides him with the "cause" necessary to excuse the procedural default of his ineffective assistance of trial counsel claims. In *Murray v. Carrier*, 477 U.S. 478, 488

---

[35] Of course, Petitioner's claims that his trial counsel were ineffective for failing to determine that Armstead's testimony was false and that Armstead had reached a deal with the prosecution must fail, as we have already rejected the underlying merits of these claims. The remainder of the preserved claims will be addressed *infra*.

(1986), the Supreme Court held that constitutionally ineffective assistance of counsel may provide grounds for "cause" for a procedural default.

Petitioner raises sixteen claims of alleged ineffective assistance of appellate counsel with respect to his direct appeal to the Hamilton County Court of Appeals. Petitioner contends that his appellate counsel were ineffective for failing to raise the following arguments:

1. The preclusion of mitigation evidence through the ineffective assistance of counsel at Petitioner's penalty hearing violated Petitioner's right to a reliable sentencing determination by an informed jury.

2. Petitioner was denied his due process, equal protection, effective assistance of counsel and statutory rights when his trial counsel failed to present evidence from an independent psychologist.

3. Misconduct by the State's attorneys occurred at the voir dire phase of Petitioner's capital trial.

4. Petitioner was deprived of his right to the effective assistance of counsel at the guilt-innocence phase of his capital trial.

5. The trial court improperly instructed the jury on causation.

6. Petitioner was deprived of his right to the effective assistance of counsel during the mitigation phase of his trial.

7. The State used a jailhouse informant to secure Petitioner's conviction.

8. The trial court's instruction to the jury that its verdict was only a recommendation diminished the jury's sense of responsibility for its decision and misled the jury concerning its key role in sentencing.

9. The trial court's penalty phase charge created an unconstitutional presumption in favor of the death sentence and effectively made that sentence mandatory in Petitioner's case.

10. The trial court improperly instructed the jury on all statutory mitigating factors.

11. The procedures and instructions of the trial court during voir dire skewed the entire capital proceeding in favor of guilty verdicts and a capital sentence.

12. The trial court's actions during Petitioner's trial denied Petitioner due process of law.

13. The admission of hearsay evidence violated Petitioner's rights of confrontation of witnesses and due process.

14. The prosecution put forward argument attacking Petitioner's failure to testify as proof of his guilt of a capital crime and as a basis for his death sentence.

15. The trial court improperly instructed the jury on reasonable doubt.

16. Erroneous jury instructions at the penalty phase violated Petitioner's rights.

### D. Procedural History of Appellate Counsel Claims

Petitioner raised his ineffective assistance of appellate counsel claims in his post-conviction petition. On October 2, 1989, the common pleas court held: "A claim of ineffective assistance of appellate counsel cannot be raised in a R.C. 2953.21 proceeding. *State v. Rone*, C-820640 (1st Dist., C/A 8/31/83)." The Hamilton County Court of Appeals had held in *Rone*, which was decided on August 31, 1983, that ineffective assistance of appellate counsel claims could not be pursued in state post-conviction proceedings. *See State v. Rone*, No. C-820640, 1983 WL 5172, at *4 (Ohio Ct. App. 1